No. 25-50914

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

FELLOWSHIP OF CHRISTIAN UNIVERSITY STUDENTS AT THE UNIVERSITY OF TEXAS AT DALLAS; RETROGRADE NEWSPAPER; YOUNG AMERICANS FOR LIBERTY, INCORPORATED; ZALL ARVANDI; TEXAS SOCIETY OF UNCONVENTIONAL DRUMMERS; STRINGS ATTACHED,

*Plaintiffs-Appellees,*

v.

KEVIN P. ELTIFE, in his official capacity as a Member of the Board of Regents of the University of Texas System; JANIECE LONGORIA, in her official capacity as a Member of the Board of Regents of the University of Texas System; JAMES C. (RAD) WEAVER, in his official capacity as a Member of the Board of Regents of the University of Texas System; NOLAN PEREZ, M.D., in his official capacity as a Member of the Board of Regents of the University of Texas System; ROBERT P. GAUNTT, in his official capacity as a Member of the Board of Regents of the University of Texas System; CHRISTINA MELTON CRAIN, ESQ., in her official capacity as a Member of the Board of Regents of the University of Texas System; JODIE LEE JILES, in his official capacity as a Member of the Board of Regents of the University of Texas System; KELCY L. WARREN, in his official capacity as a Member of the Board of Regents of the University of Texas System; JOHN M. ZERWAS, M.D., in his official capacity as Chancellor of the University of Texas System; JAMES E. DAVIS, in his official capacity as President of the University of Texas at Austin; PRABHAS V. MOGHE, in his official capacity as President of the University of Texas at Dallas; STUART W. STEDMAN, in his official capacity as a Member of the Board of Regents of the University of Texas System,

*Defendants-Appellants.*

On Appeal from the United States District Court for the Western District of Texas, Austin Division, Civil Action No. 1:25-cv-1411-DAE Hon. David Alan Ezra Presiding

## BRIEF FOR APPELLEES

JT Morris
  *Counsel of Record*
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, D.C. 20003
Tel: (215) 717-3473
jt.morris@fire.org

Sara Berinhout
Adam Steinbaugh
Hannah Abbott
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut Street, Ste. 900
Philadelphia, PA 19106
Tel: (215) 717-3473
sara.berinhout@fire.org
adam@fire.org
hannah.abbott@fire.org

*Attorneys for Plaintiffs-Appellees*

# CERTIFICATE OF INTERESTED PERSONS

The cause number and style of the case is *Fellowship of Christian University Students at the University of Texas at Dallas, et al., v. Kevin P. Eltife, et al.* (USDC Civil No. 1:25-cv-1411-DAE, Western District of Texas).

Counsel of record certifies that the following listed persons or entities described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal.

## Plaintiffs-Appellees

1. Fellowship of Christian University Students at the University of Texas at Dallas;
2. Retrograde Newspaper;
3. Young Americans for Liberty, Inc.;
4. Zall Arvandi;
5. Texas Society of Unconventional Drummers;
6. Strings Attached.

## Attorneys for Plaintiffs-Appellees

JT Morris
Foundation for Individual Rights and Expression
700 Pennsylvania Ave. SE, Ste. 340
Washington, D.C. 20003

Sara Berinhout
Adam Steinbaugh
Hannah Abbott
Foundation for Individual Rights and Expression
510 Walnut Street, Ste. 900
Philadelphia, PA 19106

**<u>Defendants-Appellants</u>**

1. Kevin P. Eltife, in his official capacity as a Member of the Board of Regents of the University of Texas System;
2. Janiece Longoria, in her official capacity as a Member of the Board of Regents of the University of Texas System;
3. James C. ("Rad") Weaver, in his official capacity as a Member of the Board of Regents of the University of Texas System;
4. Nolan Perez, M.D., in his official capacity as a Member of the Board of Regents of the University of Texas System;
5. Robert P. Gauntt, in his official capacity as a Member of the Board of Regents of the University of Texas System;
6. Christina Melton Crain, Esq., in her official capacity as a Member of the Board of Regents of the University of Texas System;
7. Jodie Lee Jiles, in his official capacity as a Member of the Board of Regents of the University of Texas System;
8. Kelcy L. Warren, in his official capacity as a Member of the Board of Regents of the University of Texas System;
9. Stuart W. Stedman, in his official capacity as a Member of the Board of Regents of the University of Texas System;
10. John M. Zerwas, in his official capacity as Chancellor of the University of Texas System;
11. James E. Davis, in his official capacity as President of the University of Texas at Austin;
12. Prabhas V. Moghe, in his official capacity as President of the University of Texas at Dallas.

**<u>Attorneys for Defendants-Appellants</u>**

Ken Paxton
Brent Webster
William R. Peterson
Daniel M. Ortner
Brian Keith Ingram
Office of the Attorney General of Texas
P.O. Box 12548 (MC 059)
Austin, TX 78711-2548

Respectfully,

/s/ JT Morris
*Counsel of Record for*
*Plaintiffs-Appellees*

iii

**STATEMENT REGARDING ORAL ARGUMENT**

Plaintiffs agree with Defendants that given the constitutional and jurisdictional issues on appeal, oral argument would aid this Court.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................... iv

TABLE OF AUTHORITIES ................................................................ vii

STATEMENT OF JURISDICTION ....................................................... 1

ISSUES PRESENTED ......................................................................... 2

INTRODUCTION ................................................................................ 3

STATEMENT OF THE CASE ............................................................... 6

SUMMARY OF THE ARGUMENT ..................................................... 15

ARGUMENT ...................................................................................... 19

I.    The Act's Plain Text Mandates Content-Based Restrictions
      on Protected Speech at Public Universities. ................................ 19

II.   Plaintiffs Have Standing to Bring This First Amendment
      Challenge. ................................................................................. 23

      A.    The Challenged Bans cast an undeniable chill over
            Plaintiffs' protected expression, establishing an injury-
            in-fact. ............................................................................ 24

      B.    Plaintiffs' injuries are traceable to Defendants .................... 31

      C.    An injunction will redress Plaintiffs' injuries. ..................... 34

III.  Defendants Are Not Entitled to Sovereign Immunity. ................. 37

IV.   The Court Should Affirm That Plaintiffs Are Likely to
      Succeed on the Merits. ............................................................... 44

      A.    The First Amendment protects Plaintiffs' expression. ......... 45

      B.    The Challenged Bans are content-based restrictions on
            speech that trigger strict scrutiny ...................................... 45

C. The Act fails strict scrutiny. ................................................... 47

D. Strict scrutiny applies regardless of public forum type. ....... 51

E. Even if subject to lower levels of scrutiny, the Act violates the First Amendment. .............................................. 53

F. The Act is unconstitutionally overbroad. ............................. 58

V. Absent Affirmance, the Act's Certain Chill on Campus Speech Will Irreparably Harm Plaintiffs. ...................................... 61

VI. The Public Interest Favors an Injunction Against S.B. 2972's Staggering Restrictions on Campus Speech. .............................. 62

VII. The Scope of the District Court's Preliminary Injunction Is Proper. .................................................................................... 63

CONCLUSION ........................................................................................ 67

CERTIFICATE OF COMPLIANCE ....................................................... 69

CERTIFICATE OF SERVICE ................................................................ 70

# TABLE OF AUTHORITIES

**Cases**

*A.B. v. Salesforce, Inc.,*
123 F.4th 788 (5th Cir. 2024) ........................................................ 19

*Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.,*
851 F.3d 507 (5th Cir. 2017) ................................................ 34, 37, 38

*Ams. for Prosperity Found. v. Bonta,*
594 U.S. 595 (2021) ....................................................................... 58

*Book People v. Wong,*
91 F.4th 318 (5th Cir. 2024) ................................................... passim

*California v. Texas,*
593 U.S. 659 (2021) ................................................................. 26, 34

*Campos-Chaves v. Garland,*
602 U.S. 447 (2024) ....................................................................... 19

*Carter v. Loc. 556, Transp. Workers Union of Am.,*
156 F.4th 459 (5th Cir. 2025) ................................................. 66, 67

*Chiles v. Salazar,*
146 S. Ct. 1010 (2026) ................................................................... 42

*Christian Legal Soc'y v. Walker,*
453 F.3d 853 (7th Cir. 2006) ......................................................... 25

*City of Austin v. Paxton,*
943 F.3d 993 (5th Cir. 2019) ................................................... 38, 39

*City of Austin v. Reagan Nat'l Advert. of Aus., LLC,*
596 U.S. 61 (2022) ......................................................................... 20

*City of Cincinnati v. Discovery Network, Inc.,*
507 U.S. 410 (1993) ........................................................... 20, 46, 48

*City of Ladue v. Gilleo,*
512 U.S. 43 (1994) ......................................................................... 57

*Coll. Republicans at San Francisco State Univ. v. Reed,*
523 F. Supp. 2d 1005 (N.D. Cal. 2007)..............................................22

*DeJohn v. Temple Univ.,*
537 F.3d 301 (3d Cir. 2008) ..............................................................60

*Direct Biologics, L.L.C. v. McQueen,*
63 F.4th 1015 (5th Cir. 2023) ...........................................................19

*Doe v. Tangipahoa Parish Sch. Bd.,*
494 F.3d 494 (5th Cir. 2007)..............................................................23

*Elrod v. Burns,*
427 U.S. 347 (1976) ...........................................................................61

*Ex parte Young,*
209 U.S. 123 (1908)..................................................................... passim

*First Choice Women's Resource Centers, Inc. v. Davenport,*
146 S. Ct. 1114 (2026)........................................................................29

*Forsyth County, Ga. v. Nationalist Movement,*
505 U.S. 123 (1992) ...........................................................................64

*Garza v. Harrison,*
574 S.W.3d 389 (Tex. 2019) ..............................................................20

*Hays Cnty. Guardian v. Supple,*
969 F.2d 111 (5th Cir. 1992)........................................................52, 53

*Healthy Vision Ass'n v. Abbott,*
138 F.4th 385 (5th Cir. 2025) ..............................................41–43, 62

*Healy v. James,*
408 U.S. 169 (1972)........................................................18, 53, 62, 63

*Hoover v. Morales,*
164 F.3d 221 (5th Cir. 1998)..............................................................65

*Houston Chronicle Pub. Co. v. City of League City,*
488 F.3d 613 (5th Cir. 2007)..............................................................24

*Jackson v. Wright,*
   82 F.4th 362 (5th Cir. 2023) ...................................................... passim

*Just. for All v. Faulkner,*
   410 F.3d 760 (5th Cir. 2005)................................................... 52, 53, 54

*Koala v. Khosla,*
   931 F.3d 887 (9th Cir. 2019)............................................................. 25

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ........................................................................ 31

*Minnesota Voters All. v. Mansky,*
   585 U.S. 1 (2018) ............................................................................ 57

*Mock v. Garland,*
   75 F.4th 563 (5th Cir. 2023) ........................................................... 66

*Moody v. NetChoice, LLC,*
   603 U.S. 707 (2024) .................................................................... 58, 66

*Nken v. Holder,*
   556 U.S. 418 (2009) ........................................................................ 62

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n,*
   460 U.S. 37 (1983) ...................................................................... 54, 56

*Police Dep't. v. Mosley,*
   408 U.S. 92 (1972) .......................................................................... 49

*Pro. Ass'n of Coll. Educators v. El Paso Cnty. Cmty. Coll. Dist.,*
   730 F.2d 258 (5th Cir. 1984)........................................................... 66

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015) ............................................................. 21, 46, 47

*Roake v. Brumley,*
   141 F.4th 614 (5th Cir. 2025) ......................................................... 41

*Roberts v. Haragan,*
   346 F. Supp. 2d 853 (N.D. Tex. 2004) ............................................ 48

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
592 U.S. 14 (2020) ...................................................... 18, 61

*RTM Media, L.L.C. v. City of Houston,*
584 F.3d 220 (5th Cir. 2009)...................................... 20, 48

*Saia v. New York,*
334 U.S. 558 (1948) ............................................................ 56

*Scott v. Schedler,*
826 F.3d 207 (5th Cir. 2016) ............................................ 65

*Shelton v. Tucker,*
364 U.S. 479 (1960) ............................................................ 62

*Speech First, Inc. v. Fenves,*
979 F.3d 319 (5th Cir. 2020) ..................................... passim

*Speech First, Inc. v. Sands,*
144 S. Ct. 675 (2024) ......................................................... 60

*Stanley v. Georgia,*
394 U.S. 557 (1969) ............................................................ 25

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ............................................................ 24

*Tex. Democratic Party v. Abbott,*
961 F.3d 389 (5th Cir. 2020).............................................. 43

*Texans for Free Enter. v. Tex. Ethics Comm'n,*
732 F.3d 535 (5th Cir. 2013).............................................. 62

*Thornhill v. Alabama,*
310 U.S. 88 (1940) .............................................................. 65

*Trump v. CASA,*
606 U.S. 831 (2025) ....................................................... 66, 67

*United States v. Doe,*
968 F.2d 86 (D.C. Cir. 1992) ............................................ 25

*United States v. Kokinda,*
497 U.S. 720 (1990) ........................................................ 52

*United States v. Playboy Ent. Grp., Inc.,*
529 U.S. 803 (2000) ........................................................ 48

*United States v. Stevens,*
559 U.S. 460 (2010) ............................................. 23, 58, 61

*Virginia v. Hicks,*
539 U.S. 113 (2003) ......................................... 64, 65, 66, 67

*Widmar v. Vincent,*
454 U.S. 263 (1981) ..................................................... 25, 47

*Wirtshafter v. Trs. of Ind. Univ.,*
784 F. Supp. 3d 1091 (S.D. Ind. 2025) ........................... 59

**Statutes**

Tex. Educ. Code
§ 51.9315............................................................... passim
§ 51.9315(a)(2) ........................................................ 6, 21, 46
§ 51.9315(c)(2) ............................................................. 8, 50
§ 51.9315(d) ............................................................ 7, 8, 20
§ 51.9315(f) .............................................................. passim
§ 51.9315(f)(1)(B) ..................................................... 7, 27
§ 51.9315(f)(2)(B)(ii) ............................................... passim
§ 51.9315(f)(2)(B)(iii) .............................................. passim
§ 51.9315(f)(2)(B)(iv) ............................................... passim
§ 51.9315(f)(2)(F) ..................................................... passim
§ 51.9315(f)(3)............................................ 11, 17, 26, 27
§ 51.9315(f)(6) ........................................................ 11, 32
§ 51.9315(g) ................................................................... 7
§ 51.9315(l) ................................................................. 22
§ 65.31(a) ..................................................................... 39

Tex. Gov't Code
§ 311.016(2) ................................................................. 20

Univ. of Tex. Sys. Bd. of Regents R. 20101

§ 2.1 ......................................................................................... 39

§ 4.1 ......................................................................................... 39

§ 4.3 ......................................................................................... 39

§ 4.9 ......................................................................................... 39

**Other Authorities**

2 Joseph Story,
Commentaries on Equity Jurisprudence (Boston, 2d ed. 1839) ......... 66

Antonin Scalia & Bryan A. Garner,
*Reading Law: The Interpretation of Legal Texts*, Canon 26
(2012) ....................................................................................... 22

Catherine Marfin,
*Texas House Passes Senate Bill Seeking to Ensure Free Speech
on College Campuses*, TEX. TRIB. (May 20, 2019) ................................. 6

Greg Abbott
(@GregAbbott_TX), X (Dec. 1, 2019, 2:27 PM) ...................................... 7

Greg Abbott
(@GregAbbott_TX), X, *I just signed a law protecting free speech
on college campuses.* (June 9, 2019, 7:12 PM) ...................................... 7

Kendall Meachum,
*UT System Approves University Free Speech Policy to Comply
with State Law*, Daily Texan (Aug. 26, 2025) ..................................... 11

S.B. 18, 86th Leg., Reg. Sess. (Tex. 2019) ................................. 3, 6, 7, 16

S.B. 2972, 89th Leg., Reg. Sess. (Tex. 2025) ................................. 3, 8, 26

Tex. House Comm. on Higher Educ.,
*Bill Analysis*, S.B. 2972, 89th Leg., Reg. Sess. (2025) ......................... 9

Univ. of Tex. Sys. Bd. of Regents,
*Comm. and Bd. Meetings Consent Agenda* (Aug. 20–21, 2025).... 11, 33

Video of UT System Board of Regents' Meeting (Aug. 21, 2025) ........... 32

## STATEMENT OF JURISDICTION

Plaintiffs disagree that the district court lacked subject-matter jurisdiction. For the reasons explained in this brief, Plaintiffs have Article III standing, and under *Ex parte Young*, sovereign immunity does not bar their claims for prospective injunctive relief.

# ISSUES PRESENTED

1.      Whether Texas's extensive content-based prohibitions on noncommercial protected expression across public university campuses violate the First Amendment.

2.      Whether Plaintiffs have Article III standing and *Ex parte Young*'s sovereign immunity exception applies where the law obligates Defendants to carry out those content-based restrictions that would chill Plaintiffs' protected expression at University of Texas System institutions.

# INTRODUCTION

Strange things can happen when the legislative and political winds shift. Texas was leading the way in protecting speech at public universities in 2019 when it enacted a law enshrining First Amendment protections for campus expression, due to concern over campus administrators silencing certain viewpoints. S.B. 18, 86th Leg., Reg. Sess. (Tex. 2019). But now the state has reshaped its once-admirable campus free speech law into a no-speech law—the "Campus Protection Act." S.B. 2972, 89th Leg., Reg. Sess. (Tex. 2025) (amending Tex. Educ. Code § 51.9315) (the "Act").

The Act *mandates* that public universities impose boundless content-based restrictions on campus speech. To start, it commands public universities to silence all noncommercial protected speech between 10:00 p.m. and 8:00 a.m. Likewise, it orders universities to bar any noncommercial expressive activity during the last two weeks of an academic term if it involves invited speakers, amplified sound, or percussion instruments. These mandates apply everywhere on campus, and regardless of whether the activity is substantially disruptive. Worse

yet, any student or student group who violates one of these mandates faces disciplinary sanctions.

The Act threatens protected expression of all kinds—including Plaintiffs' expression. The Act's restriction on invited speakers threatens the Fellowship of Christian University Students at the University of Texas at Dallas (UTD FOCUS), which relies on off-campus ministers to lead weekly on-campus worship. The ban on overnight speech will chill student journalists at *The Retrograde* from publishing after-hours breaking news. So too for any Young Americans for Liberty (YAL) student members who strategize on social media after sunset. And the Act's limits on amplified sound and percussion loom over the student music groups Texas Society of Unconventional Drummers (SOUnD) and Strings Attached, even though their end-of-semester campus performances pose no risk of disruption.

This sweeping campus censorship cannot survive First Amendment scrutiny. Texas may have an interest in limiting disruption to the academic functions of its public universities. But not only are the Act's content-based restrictions on protected speech the *most* restrictive means of pursuing that interest, they provide campus authorities a powerful tool

for silencing disfavored speech. The Act would force students to think twice before expressing an opinion after dark or during the semester's end that upsets an administrator's worldview.

Rather than seriously engage these stark First Amendment violations, Defendants insist they are entitled to sovereign immunity and that Plaintiffs lack standing to sue. They are wrong on both counts.

Defendants—officials in the University of Texas System—are required under Texas law and System policy to carry out the Act's mandatory, express restrictions on protected campus speech. The Act leaves them no discretion to do otherwise. And absent an injunction stopping Defendants from exercising that duty, Plaintiffs will suffer an intolerable chill on their protected expression. No more is needed under this Court's precedents to satisfy Article III standing and overcome Defendants' sovereign immunity defense.

This Court should affirm the district court's preliminary injunction against the enforcement of the Act's mandatory bans on protected speech.

## STATEMENT OF THE CASE

**In 2019, Texas enacts a campus free speech law broadly protecting public university students' speech.**

Seven years ago, Texas lawmakers, concerned by threats to conservative voices at public universities and colleges, enacted Senate Bill 18, a law fortifying the First Amendment's protections for students, student organizations, and guest speakers. S.B. 18, 86th Leg., Reg. Sess. (Tex. 2019).[1] To guard against the tendency of administrators to answer social and political pressures by censoring divisive viewpoints, the legislature designed S.B. 18 to limit campus officials' discretion to fashion campus speech policies. *Id.*

At S.B. 18's core was a broad definition of "[e]xpressive activities," covering "any speech or expressive conduct protected by the First Amendment," including "assemblies, protests, speeches, the distribution of written material, the carrying of signs, and the circulation of petitions," while exempting "commercial speech." Tex. Educ. Code § 51.9315(a)(2). The law protected students' and student organizations' expressive

---

[1] *See also* Catherine Marfin, *Texas House Passes Senate Bill Seeking to Ensure Free Speech on College Campuses*, TEX. TRIB. (May 20, 2019), https://www.texastribune.org/2019/05/17/texas-free-speech-college-campus-legislation [perma.cc/3SYF-7TP7].

activities, including inviting outside speakers. *Id.* §§ 51.9315(f)(1)(B), (g). And it recognized that institutions could craft narrowly tailored, content-neutral regulations governing the manner of speech (like sound levels), without imposing blanket prohibitions on speech. *E.g.*, *id.* § 51.9315(d).

When Governor Greg Abbott signed S.B. 18 into law, he expressed regret it was even necessary, because the "First Amendment guarantees" student speech rights.[2] With S.B. 18 in place, Governor Abbott announced the "[c]onservative speech" that "was under attack on college campuses" was now protected against censorship under Texas law.[3]

In 2020, this Court in *Speech First, Inc. v. Fenves* noted the same dynamic that motivated the Legislature to pass S.B. 18, cautioning courts to be "especially vigilant" against campus censorship that escalates in times of cultural and political upheaval. 979 F.3d 319, 338–39 (5th Cir. 2020). It observed that "institutional leaders, in a spirit of panicked damage control, [were] delivering hasty and disproportionate punishment instead of considered reforms." *Id.* at 339 (citation omitted).

---

[2] Video posted by Greg Abbott (@GregAbbott_TX), X, *I just signed a law protecting free speech on college campuses.* (June 9, 2019, 7:12 PM), https://x.com/GregAbbott_TX/status/1137875109362974724.

[3] Greg Abbott (@GregAbbott_TX), X (Dec. 1, 2019, 2:27 PM), https://x.com/GregAbbott_TX/status/1201236295827312640 [perma.cc/NF79-HJCQ].

So too did it discern how campus officials defended their actions by "wrap[ping] [themselves] in the flag of [their] policies' "paeans to the freedom of speech." *Id.* at 333.

**After campus demonstrations in 2024, Texas amends S.B. 18 to mandate universities suppress "expressive activities."**

In 2024, students protested across college campuses nationwide in response to the Israel-Gaza war. Under Texas's 2019 campus free speech law, public universities could limit conduct that "materially and substantially disrupt[s]" university functions or that violated existing "reasonable restrictions on the time, place, and manner of expressive activities." Tex. Educ. Code §§ 51.9315(c)(2), (d). But in those protests' wake, Texas did not stand by its 2019 law. Instead, it adopted the Campus Protection Act, transforming the broad scope of "expressive activities" the 2019 law instructed universities to safeguard into an expanse of protected expression Texas now requires universities to restrict. S.B. 2972, 89th Leg., Reg. Sess. (Tex. 2025) (amending Tex. Educ. Code § 51.9315).

In passing the Act, the Legislature professed to allow speech "while setting clear boundaries to prevent disruption and ensure community

safety."[4] But four provisions of the Act—challenged here—prohibit a staggering range of protected speech while exempting commercial speech, with no criteria regarding disruption or safety.

- **The Overnight Expression Ban.** The Act requires all Texas public universities to adopt a policy "prohibit[ing]" anyone, including students, from "engaging in expressive activities on campus between the hours of 10 p.m. and 8 a.m."[5] The ban does not authorize universities to grant exceptions or draw distinctions based on campus location or forum. Nor is it tethered to objective standards of disruption or student safety.

- **The End-of-Term Invited Speaker Ban.** Under the Act, universities must also adopt a policy that "prohibit[s] … during the last two weeks of a semester or term, engaging in expressive activities … by inviting speakers to speak on campus."[6] This ban applies campuswide, and regardless of whether a guest speaker substantially disrupts campus operations. Based on the academic calendars at UT-Austin and UT-Dallas during the 2025–2026 academic year, invited speakers would have

---

[4] ROA.798 (Tex. House Comm. on Higher Educ., *Bill Analysis*, S.B. 2972, 89th Leg., Reg. Sess. (2025)).

[5] Tex. Educ. Code § 51.9315(f)(2)(F) ("Overnight Expression Ban").

[6] Tex. Educ. Code § 51.9315(f)(2)(B)(ii) ("End-of-Term Invited Speaker Ban").

been barred for upwards of six weeks at UT-Austin and up to fourteen weeks at UT-Dallas.[7]

- **The End-of-Term Amplified Sound Ban.** The Act also commands universities to adopt a policy "prohibiting … during the last two weeks of a semester or term, engaging in expressive activities … by using a device to amplify sound."[8] The ban covers the same broad period as the invited speaker ban and applies campuswide to both indoor and outdoor spaces, regardless of sound volume or actual disruptiveness.

- **The End-of-Term Drum Ban.** Finally, the Act requires universities to adopt a policy that "prohibit[s] … during the last two weeks of a semester or term, engaging in expressive activities … by using drums or other percussive instruments."[9] This prohibition likewise applies regardless of location, volume, or actual disruptiveness.

Those four provisions (collectively, "the Challenged Bans") are not mere aspirations. The Legislature requires universities to "establish disciplinary sanctions for students, student organizations, or employees

---

[7] *See, e.g.*, ROA.759–62 (UT-Dallas 2025 and 2026 academic calendars); ROA.758 (UT-Austin 2025-2026 academic calendar); *see also* ROA.476.

[8] Tex. Educ. Code § 51.9315(f)(2)(B)(iii) ("End-of-Term Amplified Sound Ban").

[9] Tex. Educ. Code § 51.9315(f)(2)(B)(iv) ("End-of-Term Drum Ban").

who ... violate an institution policy or law." Tex. Educ. Code § 51.9315(f)(3). Meeting that command, both UT-Dallas and UT-Austin authorize disciplinary measures ranging from written warnings, probation, suspension, to even denial of a degree.[10]

**Obeying the Act, the UT Board of Regents ratifies policies at UT-Austin and UT-Dallas.**

On August 21, 2025, the UT Board of Regents, which oversees all UT System institutions, approved proposed revisions to each institution's policies to comply with the Act. *See* Tex. Educ. Code § 51.9315(f)(6) (requiring governing boards to approve the policies the Act mandates).[11]

UT-Dallas revised its policies to track the Challenged Bans nearly verbatim.[12] UT-Austin initially did the same, except for the Overnight Expression Ban.[13] Its policy instead specified that "any expressive

---

[10] ROA.153–54 (UT-Dallas Revised Policy); ROA.781–82 (UT-Dallas Policy No. UTDSP5003, Student Code of Conduct § F (rev. June 1, 2020); ROA.183–84 (UT-Austin First Revised Policy); ROA.793–94 (UT-Austin Student Conduct and Academic Integrity policy, § 11-701 (rev. Aug. 22, 2024).

[11] *See also* Univ. of Tex. Sys. Bd. of Regents, *Comm. and Bd. Meetings Consent Agenda,* 244, 252–53 (Aug. 20–21, 2025), https://www.utsystem.edu/sites/default/files/offices/board-of-regents/board-meetings/agenda-book-full/8-2025AB.pdf [perma.cc/SU3Z-TF5K]; Kendall Meachum, *UT System Approves University Free Speech Policy to Comply with State Law*, Daily Texan (Aug. 26, 2025), https://thedailytexan.com/2025/08/26/ut-system-approves-university-free-speech-policy-to-comply-with-state-law [perma.cc/D5CU-G3VB].

[12] ROA.129, 135 (UT-Dallas Revised Policy §§ A.3(8), B.9(6), B.9(9)).

[13] *See* ROA.165 (UT-Austin First Revised Policy §§ 13-301(2)(C)).

activity in the Common Outdoor Area is deemed disruptive if the sound created by the activity can be heard from a University residence after 10:00 p.m. and before 8:00 a.m. the following morning."[14] While this litigation has proceeded, UT-Austin has twice revised its policies. First, it revised its End-of-Term Amplified Sound and Drum Bans to apply to "Common Outdoor Areas" across campus.[15] And second, it revised the End-of-Term Bans' restrictions on disruptive expressive activities.[16]

**The Act threatens Plaintiffs' expressive activities.**

Each of the Plaintiffs seeks to engage in protected expression that the Challenged Bans prohibit.

- **UTD FOCUS**: An interdenominational Christian student organization, UTD FOCUS's student members use campus spaces to host weekly worship and fellowship events throughout the year. ROA.15 ¶¶ 12–13; ROA.33 ¶ 113. UTD FOCUS relies on off-campus ministers to lead these on-campus events. *Id.* ¶¶ 113–14. Its members also hold early morning one-on-one meetings to discuss issues of faith, and often stay

---

[14]  ROA.166–66 (UT-Austin First Revised Policy §§ 13-301(2)(F), 13-304(3)).

[15]  *See* ROA.435–36 (describing amendment to UT-Austin policy).

[16]  *See* Defs.' Br. 9 n. 1.

12

past the formal 10:00 p.m. conclusion of evening events for continued discussion and fellowship. ROA.28–29 ¶¶ 89–91.

- ***The Retrograde***: An independent student newspaper at UT-Dallas, *The Retrograde*'s journalists and editors gather news, write, edit, and publish stories after 10:00 p.m. from locations across campus. ROA.30 ¶¶ 97–99. They also invite non-student sources to interview on campus year-round. ROA.33 ¶¶ 115–16.

- **Young Americans for Liberty (YAL) and Zall Arvandi**: A national grassroots organization dedicated to mobilizing college students on the ideals of liberty and the Constitution, YAL has thousands of student members across the country, including at UT-Austin, UT-Dallas, and other UT System institutions. ROA.16–17 ¶¶ 17–19. YAL's members—including Plaintiff and UT-Austin student Zall Arvandi—rely on YAL staff to help with campus recruitment and petitioning efforts during the critical final two weeks of terms. ROA.34 ¶¶ 117–120. YAL members (including Arvandi) plan to use megaphones while soliciting support for petitions as part of YAL's "Student Rights Campaigns" program. ROA.36–37 ¶¶ 130–33. And YAL members,

including Arvandi, will petition, talk, and post on social media about YAL business between 10:00 p.m. and 8:00 a.m. ROA.29 ¶¶ 92–96.

- **SOUnD**: A registered student organization at UT-Austin, the percussive ensemble SOUnD plans to continue its indoor and outdoor end-of-semester music performances, which focus on exploring alternative percussion techniques, such as using paint buckets and cafeteria trays as percussion instruments. ROA.17 ¶ 20; ROA.39 ¶¶ 143–46.

- **Strings Attached**: A registered student organization at UT-Dallas, Strings Attached regularly performs themed concerts at venues across campus using drums and amplified sound. ROA.17 ¶ 21; ROA.38 ¶ 137–38. Strings Attached plans to continue its performances, some of which occur during the final two weeks of UT-Dallas' academic terms and sessions. ROA.37–38 ¶¶ 136–38. The group's practices and performances frequently last until after 10:00 p.m. ROA.31 ¶¶ 101–104.

**The district court enjoins Defendants from enforcing the Challenged Bans.**

Plaintiffs sued to enjoin the Challenged Bans and any campus policies implementing those bans. ROA.68–69. On October 14, 2025, the district court entered a preliminary injunction enjoining Defendants

from enforcing the Challenged Bans against (a) Plaintiffs' expression and (b) any "expressive activities" at UT-Austin and UT-Dallas. ROA.481–82. Likewise, it enjoined the UT System Board Defendants from enforcing the bans against "expressive activities" at any UT System institution. ROA.482.

The district court rejected Defendants' arguments that Plaintiffs lacked standing and held Defendants are not entitled to sovereign immunity, holding the Act's mandatory language would compel Defendants to enforce the Challenged Bans. ROA.441–62. Turning to the likelihood of success, the district court held both that Defendants failed to satisfy strict scrutiny as triggered by the content-based Challenged Bans, and that the bans' staggering breadth make them unconstitutionally overbroad. ROA.462–478. And even if intermediate scrutiny applies, the district court concluded, the bans also cannot satisfy it. ROA.472–74; ROA.478.

## SUMMARY OF THE ARGUMENT

The Texas Legislature cannot send the First Amendment to bed at 10:00 p.m. Nor can it banish a host of protected expression from public

universities during finals week. The district court rightly enjoined Defendants from enforcing the Legislature's speech-chilling commands.

When passing the 2019 statute cementing protections for campus expression, Texas adopted a broad "expressive activities" definition: "any speech or expressive conduct protected by the First Amendment to the United States Constitution." S.B. 18, 86th Leg., Reg. Sess. (Tex. 2019). The 2025 Act warps that definition to violate the First Amendment. It requires universities to ban those broadly defined "expressive activities" (i) for ten hours a day and (ii) in multiple contexts during the last two weeks of any university term. And because the statute's text excludes commercial speech from "expressive activities," the Act facially discriminates against protected expression based on its content.

While Defendants try to rewrite the Act as vesting them with broad discretion to mold campus expression policies, the Act's text proves them wrong. It commands that universities "shall" implement the Challenged Bans in campus policy—in all spaces, and regardless of whether an activity is disruptive. So even a quiet midnight worship service or a gathering breaking campus news at dawn falls victim to the Act's vast sweep.

Equally wrong is Defendants' argument that the Act does not regulate students. By contrast, Defendants must "establish disciplinary sanctions for students [and] student organizations" who violate a campus speech policy or a state law. Tex. Educ. Code § 51.9315(f)(3). That threat forces Plaintiffs into a stark choice: self-censor or risk punishment.

This Court's precedent affirms that chill on Plaintiffs' speech establishes an Article III injury. *Speech First*, 979 F.3d at 330–31. And because "the threat [to protected speech] is latent in the existence of the statute," *id.* at 336 (cleaned up), the chill on Plaintiffs' expression will endure absent an injunction.

Under Texas law and UT System policy, Defendants play an indispensable role in carrying out the Act's mandates, establishing that Plaintiffs' chilling injuries are traceable to Defendants. *See Book People v. Wong*, 91 F.4th 318, 332–33 (5th Cir. 2024). That role establishes Defendants have more than the "scintilla of enforcement" needed for *Ex parte Young*'s exception to sovereign immunity to apply. In fact, this Court recently rejected similar sovereign immunity arguments from public university officials. *Jackson v. Wright*, 82 F.4th 362, 367–68 (5th Cir. 2023). It should do so again here.

17

And Plaintiffs are likely to succeed on the merits. Each of the Challenged Bans is content-based and fails strict scrutiny. No matter Texas's interest in curbing campus disruptions, the Act's sweeping bans on protected speech are the *most* restrictive means of meeting that interest. As the district court observed, narrower laws and policies already exist to curb substantial campus disruptions. ROA.468–69. The Act's limitless sweep also invites arbitrary enforcement against disfavored speech—if there were ever a case tailor-made for the overbreadth doctrine, this is it.

The Act will irreparably harm Plaintiffs' rights to worship, report, perform, advocate, and simply speak. That is "unquestionably" irreparable injury. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). The equities also favor a preliminary injunction. Averting an extensive chill to speech on campus—where First Amendment protections are "nowhere more vital," *Healy v. James*, 408 U.S. 169, 180 (1972) (citation omitted)—will serve the public interest.

Finally, the scope of the district court's injunction is proper. By enjoining Defendants from enforcing the Act, the injunction necessarily prevents them from enforcing the Act's bans through campus policy. And

because of the Act's extensive sweep, lacking few if any constitutional applications, an injunction spanning the UT System is apt, as it will prevent Defendants from chilling thousands of campus speakers.

The district court did not abuse its discretion issuing a preliminary injunction against enforcement of the Challenged Bans, as both its legal and factual conclusions were sound. *See Direct Biologics, L.L.C. v. McQueen*, 63 F.4th 1015, 1020 (5th Cir. 2023). This Court should affirm.

## ARGUMENT

### I. The Act's Plain Text Mandates Content-Based Restrictions on Protected Speech at Public Universities.

Defendants cannot avoid the Act's unambiguous text mandating content-based restrictions on campus speech, despite their efforts to rewrite the Act as granting them wide discretion to create modest time, place, and manner guidelines. "As always, we start with the text." *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 793 (5th Cir. 2024) (quoting *Campos-Chaves v. Garland*, 602 U.S. 447, 457 (2024)). The Act's text is clear: it commands that universities "shall adopt" policies including the Challenged Bans. Tex. Educ. Code § 51.9315(f). Under Texas law, "[t]he term 'shall,' as the Legislature has explained in the Code Construction

Act, 'imposes a duty.'" *Garza v. Harrison*, 574 S.W.3d 389, 402 (Tex. 2019) (quoting Tex. Gov't Code § 311.016(2)).

At the same time, nothing in the Act's text suggests public universities may deviate from the Challenged Bans. *See generally* Tex. Educ. Code § 51.9315; *but cf.* Defs.' Br. 20. Had the Legislature intended otherwise, it would have used "may" instead of "shall," as it did in telling universities they "may adopt" reasonable time, place, and manner restrictions in common outdoor areas. Tex. Educ. Code § 51.9315(d). But it did not. Nor did it carve out discretion for campus authorities to limit the Challenged Bans to certain areas of campus or only substantially disruptive activities.

The Act's text also confirms the Challenged Bans are facially content-based because they restrict communicating a message for noncommercial purposes while exempting commercial speech. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429–30 (1993) (holding city's prohibition of news racks for commercial but not noncommercial publications was content-based); *see also City of Austin v. Reagan Nat'l Advert. of Aus., LLC*, 596 U.S. 61, 74 (2022); *RTM Media, L.L.C. v. City of Houston*, 584 F.3d 220, 224–25 (5th Cir. 2009). Each

Challenged Ban restricts "expressive activities." Tex. Educ. Code §§ 51.9315(f)(2)(B)(ii-iv), (f)(2)(F). In turn, the operative statute defines "expressive activities" as "any speech or expressive conduct protected by the First Amendment to the United States Constitution" *except* commercial speech. *Id.* § 51.9315(a)(2).

The Challenged Bans are thus content-based restrictions on protected speech, because they "cannot be justified without reference to the content of the regulated speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (citation omitted). As the district court rightly put it, the Act requires a campus speaker to "first determine if their activity or speech is commercial or non-commercial" when assessing whether their expression abides by the Challenged Bans and any implementing policies. ROA.465.

In short, the Act's text establishes the Challenged Bans are mandatory content-based restrictions on protected speech that apply to all campus spaces, even if an expressive activity is not substantially disruptive. There is no other plausible construction.

While Defendants point to language stating, "[n]othing in this section may be construed to limit or infringe on a person's right to

freedom of speech or expression protected by the First Amendment," Defs.' Br. 3, 8 (citing Tex. Educ. Code § 51.9315(l)), that clause is illusory. Giving it effect would render the Challenged Bans and their sweeping restrictions on all protected noncommercial speech mere surplusage, if not an absurd construction. And courts do not interpret statutes in ways that give their provisions no consequence. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, Canon 26 (2012). What's more, the saving clause "appears at the end of a long regulation and in a paragraph [ ] separated from the regulation's substantive proscriptions," underscoring why it does not alter the Challenged Bans' plain text. *Coll. Republicans at San Francisco State Univ. v. Reed*, 523 F. Supp. 2d 1005, 1020 (N.D. Cal. 2007).

In effect, Defendants invoke the saving clause to suggest the Court can trust them to "balance" First Amendment rights with the Act's interest in curbing campus disruption. *See* Defs.' Br. 20. But that argument ignores the Act's clear mandates restricting protected speech. So too does it overlook the Supreme Court's holding that government officials cannot rescue a statute targeting protected expression by

22
22

promising to enforce it responsibly. *United States v. Stevens*, 559 U.S. 460, 480 (2010).

Even without the Supreme Court's admonishment, Texas law and UT System policy require Defendants to oversee and enforce the Act within the UT System, including at UT-Austin and UT-Dallas. *See infra* Section II.B. Defendants have no choice but to implement and enforce the Challenged Bans, each of which violates the First Amendment and will chill protected expression across the UT System. *See infra* Section IV. Because only injunctive relief can thwart that unconstitutional chill on campus speech, this Court should affirm.

## II. Plaintiffs Have Standing to Bring This First Amendment Challenge.

The district court correctly held Plaintiffs satisfy every requirement for Article III standing, especially at this early stage where "the manner and degree of evidence required to show standing is less than at later stages." *Speech First*, 979 F.3d at 329. To have standing, "the plaintiff [must have] personally suffered some actual or threatened injury that can fairly be traced to the challenged action and is redressable by the courts." *Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494, 496 (5th Cir. 2007). As this Court "has repeatedly held, in the pre-enforcement context,

[ ] '[c]hilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement'" for standing. *Speech First*, 979 F.3d at 330–31 (quoting *Houston Chronicle Pub. Co. v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007)).

The record leaves no doubt the Challenged Bans will chill Plaintiffs' protected speech under threat of punishment. And those chilling injuries are traceable to Defendants—after all, they *must* implement and enforce the Challenged Bans. Finally, enjoining Defendants from doing so will redress the harm to Plaintiffs' protected speech.

### A. The Challenged Bans cast an undeniable chill over Plaintiffs' protected expression, establishing an injury-in-fact.

In a pre-enforcement First Amendment challenge, plaintiffs suffer an Article III injury if (a) they have the "intention to engage in a course of conduct arguably affected with a constitutional interest," (b) the conduct is "arguably ... proscribed by" the challenged law, and (c) "the threat of future enforcement of the [challenged law] is substantial." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–64 (2014). Plaintiffs satisfy each of those elements.

To start, Plaintiffs' worship and discussions of faith, newsgathering and reporting, political advocacy, and musical performance all fall squarely within the First Amendment's protections. *E.g.*, *Widmar v. Vincent*, 454 U.S. 263, 270–71 (1981) (recognizing First Amendment protection for "religious groups and speakers" to use campus facilities); *Koala v. Khosla*, 931 F.3d 887, 896–906 (9th Cir. 2019) (explaining First Amendment protections for student journalists at public universities); *Speech First*, 979 F.3d at 330–34 (describing First Amendment rights of students and student organizations at UT-Austin to "engage in robust debate" on "political topics"); *United States v. Doe*, 968 F.2d 86, 87 (D.C. Cir. 1992) (holding there is "no question that beating a drum in the context of a clearly identified anti-war demonstration is expressive conduct protected by the First Amendment"). So too does the First Amendment protect a student group's interests in inviting speakers to campus. *See, e.g.*, *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (upholding "the right to receive information" from others); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861 (7th Cir. 2006) ("Implicit in the First Amendment freedoms of speech, assembly, and petition is the freedom to gather together to express ideas—the freedom to associate"). Defendants

do not dispute these First Amendment protections for Plaintiffs' expression.

Nor can they dispute that Plaintiffs' speech is "arguably … proscribed by" the Act. Plaintiffs have verified how the Challenged Bans and the implementing campus policies chill their expressive activities.[17] ROA.44–45 ¶¶ 171–74, 176 (UTD FOCUS); ROA.45–46 ¶¶ 178–81, 184 (*The Retrograde*); ROA.47–48 ¶¶ 186–92, 194–95 (YAL and Arvandi); ROA.48–49 ¶¶ 197–200 (SOUnD); ROA.49 ¶¶ 202–05 (Strings Attached). And that chill is especially pronounced because Defendants must "establish disciplinary sanctions for students [and] student organizations" who violate a Challenged Ban or an implementing policy. Tex. Educ. Code § 51.9315(f)(3).

Unable to avoid the Act's chill on Plaintiffs' speech, Defendants pivot to insisting "Plaintiffs cannot credibly allege a viable threat that S.B. 2972 will be enforced against them because the statute's commands and prohibitions do not apply to students." Defs.' Br. 23. They are wrong.

---

[17] To that end, the Court can quickly dispose of Defendants' misplaced reliance on *California v. Texas*. Defs.' Br. 23 (citing 593 U.S. 659, 669 (2021)). That case involved a statutory challenge under the Commerce and Tax Clauses, far removed from this First Amendment challenge in which Plaintiffs' chilling injury satisfies standing. *Speech First*, 979 F.3d at 330–31.

26

The Act's text repeatedly regulates "students" and "student organizations." For instance, the Act makes the right of "student organizations" to "invite speakers" to campus "subject to" the Invited Speaker Ban. Tex. Educ. Code § 51.9315(f)(1)(B). And again, the statute threatens discipline for "students and student organizations" who violate the Challenged Bans. Tex. Educ. Code § 51.9315(f)(3).

Even more, Defendants' argument ignores that a chilling injury alone satisfies Article III's requisite injury-in-fact. *Speech First*, 979 F.3d at 330–31. So whether the Act directly regulates students is not the controlling question; it is whether the Act chills Plaintiffs' speech. *See id*. The answer is it undeniably does, as explained above.

In any case, direct regulation is not required to establish standing in a First Amendment statutory challenge, as this Court recently affirmed. *Book People*, 91 F.4th at 330–31. Despite Defendants' reliance on that decision, Defs.' Br. 24, a faithful reading reveals this Court rejected the same arguments in *Book People* that Defendants make here.

In *Book People*, Texas claimed booksellers lacked Article III injury in a First Amendment challenge to a statute requiring them to rate library books, because the state enforced the statute through school

27

districts instead of directly against the booksellers. 91 F.4th at 330. But this Court disagreed. Affirming that a First Amendment injury can include one "produced by determinative or coercive effect upon the action of someone else," it held there was "a credible threat of enforcement" establishing standing. *Id.* at 331.

The Court should hold the same here. Although Texas enforces the Challenged Bans through public universities, those campus speech restrictions are mandatory. And so the resulting chill on Plaintiffs' speech is "determined or coerced by the State" through the Act, establishing an injury-in-fact. *Id.*

If Defendants are asserting Plaintiffs lack an injury-in-fact because the Act "contains no enforcement mechanism," *see* Defs.' Br. 7, 23, that argument also fails. For one thing, enforcement is baked into the statute: Defendants *must* implement the Challenged Bans and create disciplinary sanctions for violations. By any measure, that's tantamount to enforcement, no matter what Defendants may wish "enforcement" to mean.

Even if the Act's restrictions are not self-enforcing, *see* Defs.' Br. 17, 20, that does not lessen the chilling injury that establishes Plaintiffs'

28

standing. "The value of a sword of Damocles is that it hangs—not that it drops." *First Choice Women's Resource Centers, Inc. v. Davenport*, 146 S. Ct. 1114, 1127 (2026) (upholding a party's standing to challenge a non-self-executing state subpoena in federal court on First Amendment grounds). No doubt, the Act hangs over Plaintiffs' protected speech, creating a chilling uncertainty over whether they risk discipline for worshipping with invited ministers, rehearsing music, reporting the news, or hosting a political speaker at the wrong time of day or the wrong week of the year.

That is why Defendants' focus on the campus implementing policies misses the mark. *E.g.*, Defs.' Br. 20–21. A "plaintiff who mounts a pre-enforcement statutory challenge on First Amendment grounds need not show that the authorities have threatened to prosecute him …; the threat is latent in the existence of the statute." *Speech First*, 979 F.3d at 336 (cleaned up). Whatever the UT-Austin and UT-Dallas policies provide, existence of the Act's speech-chilling mandates alone establishes an injury-in-fact. *Id.*

What's more, the Act denies Defendants discretion to deviate from the unconditional text of the Challenged Bans. While Defendants argue

otherwise, they point to nothing in the Act beyond the ineffective saving clause. Defs.' Br. 20.

By contrast, UT-Dallas's enacted policy "compl[ies] with the full text" of the Challenged Bans, adopting them nearly word-for-word. ROA.341. Not only do Defendants have no answer to UT-Dallas's exacting adoption of the Challenged Bans, but that adoption refutes Defendants' claim that Plaintiffs' injuries are a "highly speculative fear." Defs.' Br. 26. This all underscores why UTD FOCUS, *The Retrograde*, and Strings Attached—student organizations at UT-Dallas—have established an injury-in-fact.

And while UT-Austin's current implementing policies may not precisely track the Challenged Bans, that is immaterial to standing. As the district court correctly observed, because Texas has commanded UT-Austin officials to carry out the Challenged Bans, "Defendants cannot guarantee that UT-Austin will not later amend its policies to comply with the statute." ROA.459. In fact, even though the UT-Austin Dean of Students submitted a declaration below describing the university's efforts to carry out the Act's mandates, it lacks any promise the university will not amend its policies—as it has twice during this

litigation—more closely to the Challenged Bans' plain text. ROA.336–39. That is a far cry from the "absolute certainty" this Court has required for university officials to refute a threat of future enforcement. *Speech First*, 979 F.3d at 329. For these reasons, Plaintiffs YAL, Arvandi, and SOUnD, all of whom engage in protected speech at UT-Austin, have shown a justiciable injury-in-fact.

## B. Plaintiffs' injuries are traceable to Defendants.

Texas law and UT System policy make each Defendant responsible for carrying out the Act's mandatory prohibitions on protected speech that are irreparably injuring Plaintiffs. "To prove traceability, Plaintiffs must allege 'a causal connection between the injury and the conduct complained of.'" *Book People*, 91 F.4th at 332 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). By any measure, there is a causal connection between Plaintiffs' injuries and Defendants' duty to carry out the Act's commands.

Take first Defendants Davis and Moghe, the respective presidents of UT-Austin and UT-Dallas. The presidents are responsible for policies relating to students. ROA.753 (Univ. of Tex. Sys. Bd. of Regents R. 20201

31

§ 4.3). It follows, then, that they have a duty to ensure university policies implement the Challenged Bans.

The Presidents also play a direct role enforcing those implementing policies. For instance, President Davis hears petitions of student disciplinary actions—like those Texas requires for students who violate campus speech policies—and can also appoint personnel to hear those violations. ROA.786 (UT-Austin R. §§ 11-300(a)(5), (16), (25)); ROA.790 (UT-Austin R. § 11-504(g)(2)–(3)); ROA.744–45 (UT-Austin First Revised Policy § 13-1202). President Moghe has the same appointment power. ROA.731 (UT-Dallas Revised Policy § 49(5)). In short, because the Presidents "oversee the challenged process" and take actions "among those that would contribute to Plaintiffs' harm," their injuries are traceable to both. *Book People*, 91 F.4th at 332–33 (cleaned up).

So too for the Board Defendants and Chancellor Zerwas. The Texas Education Code requires the Board Defendants to review and approve UT System institutional policies implementing the Act, which they did.[18] Tex. Educ. Code § 51.9315(f)(6). Chancellor Zerwas also confirmed his

---

[18] Video of UT System Board of Regents' Meeting at 5:11–7:52 (Aug. 21, 2025), https://bit.ly/utsysvideo (approving consent agenda with campus policies implementing the Act).

role in carrying out the Act's unconstitutional mandates, recommending that the Board Defendants approve UT-Austin's and UT-Dallas's revised policies implementing the Act's mandates.[19] By overseeing the process for carrying out the Act's coercive chill on campus speech, the Board Defendants and Chancellor Zerwas have the required causal connection to Plaintiffs' injuries. *See Book People*, 91 F.4th at 332–33.

In essence, Defendants are the *only* parties to whom Plaintiffs' injuries from the Act are traceable. Still, Defendants argue otherwise, suggesting they do not directly enforce the Act against Plaintiffs. Defs.' Br. 24. This traceability argument fails for the same reasons their argument fails as to Plaintiffs' injury-in-fact. *See supra* Section II.A.

Defendants also distort this Court's holding in *Book People* that the booksellers lacked standing against officials "responsible for promulgating the library-collection standards." Defs.' Br. 24 (quoting *Book People*, 91 F.4th at 332). That holding made sense because the "library collection standards" were "not at issue on appeal." 91 F.4th at 325. Not so here, as this appeal centers on the Challenged Bans. And

---

[19] UT System Board of Regents, *Comm. and Bd. Meetings Consent Agenda, supra* note 11, at 252.

unlike the booksellers who had "not explained how their injuries are otherwise traceable" to those officials, *id.* at 332, Plaintiffs have explained how Defendants' duties and actions to implement the Act's mandatory speech restrictions are causally connected to their chilling injuries. Even more so because the mandatory nature of the Challenged Bans means Defendants "will likely react in predictable ways." *Id.* at 332 (quoting *California v. Texas*, 593 U.S. at 675).

## C. An injunction will redress Plaintiffs' injuries.

An injunction will prevent Defendants from carrying out the Act's mandatory campus speech restrictions that would chill Plaintiffs' protected expression. That is exactly the "favorable decision [that] will relieve a discrete injury" redressability requires. *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 514 (5th Cir. 2017) (citation omitted).

Even so, Defendants dispute redressability, claiming that "[e]njoining S.B. 2972 will not result in an injunction against the campus specific speech policies that actually apply to Plaintiffs," such that enjoining the Challenged Bans "will not 'provide relief' because campus-policies 'independently caus[e]' the same alleged injury." Defs.' Br. 25.

But they overlook a key fact: The Act and the campus policies implementing it are not independent of each other. Rather, the implementing policies result directly from the Act's mandates.

The Dean of Students at UT-Dallas concedes as much, explaining the institution "revise[d] the Speech Policy to comply with the full text of [the Act]." ROA.341; *see also* ROA.336 (admitting UT-Austin revised its speech policies in response to the Act). So if this Court affirms that the Challenged Bans violate the Constitution, any current or future campus policy implementing the Challenged Bans violates the Constitution, too.[20] And as Plaintiffs explain, both the Act and the UT-Austin and UT-Dallas implementing policies violate their First Amendment rights and open them to punishment. *E.g.*, ROA.44 ¶ 171; ROA.46 ¶ 181, ROA.46 ¶¶ 181, 184; ROA.48–49 ¶¶ 195, 199–200, 204–05; *see also infra* Section IV.

For those reasons, enjoining Defendants from enforcing the mandatory Challenged Bans will not only redress the First Amendment harm those mandates would cause Plaintiffs, it will also redress the same harm any implementing policy would cause. For instance, enjoining

---

[20] While Defendants frame Plaintiffs as not seeking injunctive relief as to the campus implementing policies, Plaintiffs' Complaint expressly prays for the district court to enjoin both the Challenged Bans and any implementing policies. ROA.69.

President Moghe from carrying out his duty to enforce the Act's mandatory restrictions on protected speech will ensure he cannot exercise his authority to oversee and appoint staff to hear violations of UT-Dallas's implementing policy. In the same way, an injunction will prevent the other Defendants from fully activating the Act's latent threat to campus speech at UT-Austin.

There is another reason why a preliminary injunction will redress the Act's chill on protected campus speech: The Challenged Bans' staggering scope arms administrators with a potent tool to arbitrarily silence disfavored speech. Indeed, as the UT-Austin Dean of Students admits, the university vests "administrators and law enforcement" with unbridled discretion to determine what expression violates university policy ROA.337.

This is no hypothetical threat. If the Overnight Expression Ban is not enjoined, student journalists like those at *The Retrograde* who criticize the campus administration are not safe if they gather news and publish after sundown. ROA.30 ¶¶ 97–99; ROA.46 ¶ 184; ROA.72. Administrators can wield the Invited Speaker Ban to punish those like Plaintiff Arvandi who might invite a divisive political speaker at

semester's end. ROA.34 ¶ 120; ROA.47 ¶¶ 186–188; ROA.74. So too can they stifle students like UTD FOCUS who use non-disruptive amplified sound for a Christmastime service, if it merely offends a secular dean. ROA.36 ¶¶ 128–129; ROA.44 ¶ 171; ROA.71. The Constitution forbids university officials from arbitrarily wielding the Act as a campus speech code. *See Speech First*, 979 F.3d at 338–39 (noting courts' consistency in rejecting university speech codes).

Because Plaintiffs' chilling injuries are traceable to Defendants and redressable only with a preliminary injunction, this Court should affirm the district court's holding that Plaintiffs have standing.

## III.  Defendants Are Not Entitled to Sovereign Immunity.

Defendants lack sovereign immunity for the same reasons Plaintiffs have standing, *Air Evac EMS*, 851 F.3d at 520 (noting "significant overlap" between Article III standing and sovereign immunity analyses)—and also because the *Ex parte Young* exception applies given Plaintiffs "sue[d] the right defendants and ask[ed] for the right remedy." *Jackson*, 82 F.4th at 367 (citing *Ex parte Young*, 209 U.S. 123 (1908)). Here, each Defendant meets *Ex parte Young*'s requirement that they have "some connection [to] the enforcement" of the Challenged

Bans. *Air Evac EMS*, 851 F.3d at 519 (quoting *Ex parte Young*, 209 U.S. at 157). In assessing that connection, this Court has looked to whether the official has "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Book People*, 91 F.4th at 335 (footnote omitted) (quoting *City of Austin v. Paxton*, 943 F.3d 993, 1000 (5th Cir. 2019)). Plaintiffs satisfy both elements.

Start with this Court's recent decision *Jackson*, in which it rejected a similar sovereign immunity defense from campus officials. 82 F.4th at 367–68; *see also* ROA.445–47 (applying *Jackson* to hold Plaintiffs overcome Defendants' sovereign immunity defense). In *Jackson*, University of North Texas administrators removed a professor from his role on an academic journal after students complained it was publishing "racist sentiments." 82 F.4th at 365–66. The professor sued for First Amendment retaliation, seeking prospective relief against UNT Board of Regents members. *Id*. The board members played no direct role in removing him, echoing Defendants' suggestion here that they lack a direct role in enforcing the Act. Defs.' Br. 29.

Yet this Court held the board's role as the university's governing body met *Ex parte Young*'s requirement that officials have "some

38

connection with the enforcement of the challenged law or policy." *Id*. at 367 (quoting *Ex parte Young*, 209 U.S. at 157) (cleaned up). That "governing authority," this Court held, satisfied the "mere scintilla of enforcement by the relevant state official with respect to the challenged law." *Id*. (quoting *City of Austin*, 943 F.3d at 1002) (cleaned up).

If the university board members were the "right defendants" under *Ex parte Young* in *Jackson*, then Defendants are the "right defendants" here. Each Defendant has sufficient "governing authority" over the Act's unconstitutional mandates. For instance, the Board Defendants must "govern, operate, support, and maintain" UT-Austin and UT-Dallas. Tex. Educ. Code § 65.31(a). Likewise, Chancellor Zerwas has "direct line responsibility" for UT System operations. Univ. of Tex. Sys. Bd. of Regents R. 20101 § 2.1 (emphasis added). And Presidents Davis and Moghe must develop and administer "policies relating to students" and "rules and regulations for the governance of the institution." *Id*. at R. 20201 §§ 4.1, 4.3 & 4.9. Defendants' "governing authority," *Jackson*, 82 F.4th at 367, thus defeats their argument that they lack "sufficient connection" to enforcing the Act, Defs.' Br. 33.

Defendants try to distinguish *Jackson* by arguing the university trustees there "had direct involvement in the alleged constitutional violation"—but that fails twice over. Defs.' Br. 35. First, it ignores *Jackson*'s holding that public university officials' governance authority alone provides a sufficient connection to a constitutional violation. *Jackson*, 82 F.4th at 367. Second, Defendants' connection with the Act extends well beyond their governance authority. As Plaintiffs detail above, the Board Defendants and the Chancellor each play a direct role in carrying out the Act's mandatory restrictions on protected speech at UT System campuses. *See supra* Section II.B. Thus, Defendants are wrong in insisting "Plaintiffs presented no evidence that the Chancellor or members of the Board of Regents exercise supervisory control or oversight over the implementation of student speech policies at UT campuses." Defs.' Br. 36.

So too for Presidents Davis and Moghe. *See* Defs.' Br. 36–38. While the deans of students at those institutions might be frontline enforcers of any implementing policies, *see id.* at 37, that does not make the Presidents the "wrong" defendants. Again, both President Davis and President Moghe are not only responsible for policies relating to

students—and thus responsible for enforcing the Act's mandates—they also play a direct role enforcing any implementing policies. *See supra* Section II.B.

At bottom, *Ex parte Young* applies because Defendants are "not merely permitted to adopt rules and regulations implementing" the Act—they "must do so." *Roake v. Brumley*, 141 F.4th 614, 639 (5th Cir. 2025) (holding *Ex parte Young* exception applied), *reh'g granted, vacated, and reversed on other grounds*, 170 F.4th 292 (5th Cir. 2026). As this Court has explained, when officials have a mandatory duty to enforce an unconstitutional statute, that strips the official of sovereign immunity. *Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 397–98 (5th Cir. 2025). That's especially so when the statute imposes the "threat of onerous penalties is an ongoing 'compulsion or constraint.'" *Id.* Here, Plaintiffs show how the Act's mandatory speech restrictions and disciplinary sanctions will lead to self-censorship. *E.g.*, ROA.44 ¶ 171; ROA.45 ¶ 181, ROA.46 ¶ 184; ROA.48–49 ¶¶ 195, 199–200, 204–05.

And because of those mandatory duties, the Court should reject Defendants' claim that they lack the authority to directly enforce the Act. Defs.' Br. 33–38. That argument makes little sense given they have

complete authority to implement and maintain the Challenged Bans. In this First Amendment challenge, Defendants' "word game[s]" over what enforcement means have no place. *Chiles v. Salazar*, 146 S. Ct. 1010, 1023 (2026).

In any event, as this Court explained in *Book People*, the lack of direct enforcement authority is no bar to *Ex parte Young* applying. 91 F.4th at 335–36. It is enough that a defendant's authority under a statute "compel" or "constrain" an unconstitutional result, *id*, as Defendants' non-discretionary authority does here.

By carrying out the Act's mandates, Defendants have also shown "demonstrated willingness" to enforce those mandates. *See Healthy Vision Ass'n*, 138 F.4th at 398. For instance, the Board Defendants and Chancellor Zerwas approved nearly verbatim adoption of the Challenged Bans into UT-Dallas's policy, and President Moghe has ultimate responsibility for that implementing policy. *See supra* Section II.B.

And while the current UT-Austin implementing policy is not a verbatim adoption like that at UT-Dallas, *Ex parte Young* still applies. "Willingness" need not "be understood so rigidly as to thwart its orienting purpose." *Healthy Vision Ass'n*, 138 F.4th at 398. It does not, as

Defendants suggest, require Plaintiffs to provide concrete evidence Defendants will amend the UT-Austin policies to align more closely with the Challenged Bans' text. Defs.' Br. 26. Rather, "some scintilla" of future enforcement is enough. *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 401 (5th Cir. 2020).

Here, UT-Austin's Dean of Students confirmed UT-Austin changed its policies in response to Texas passing the Act. ROA.336. That, along with Act's mandate that Defendants constrain campus speech, is more than "some scintilla" of future enforcement. On the other hand, Defendants offer no evidence suggesting they "may simply choose not to enforce the" Act, or intend not to, undermining their sovereign immunity defense. *Healthy Vision Ass'n*, 138 F.4th at 400.

The bottom line is this: Defendants have a mandatory duty to carry out the Challenged Bans, establishing the "sufficient connection" to the Act's inevitable chill on Plaintiffs' protected speech. As the district court correctly held, that overcomes Defendants' sovereign immunity defense. ROA.442–47. This Court should hold the same.

## IV. The Court Should Affirm That Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to succeed in showing the Challenged Bans violate the First Amendment both facially and as applied to Plaintiffs. Defendants do not dispute the First Amendment protects Plaintiffs' expression. And as content-based restrictions that expressly apply only to noncommercial speech, the Challenged Bans trigger strict scrutiny. Defendants fail that exacting test.

A prohibition on all protected noncommercial expression for ten hours each day is not the least restrictive means to meet any compelling state interest. Neither are bans on protected expression during the last two weeks of a school term, especially because they prohibit non-disruptive speech. Even if the Challenged Bans are content-neutral time, place, or manner restrictions subject to intermediate scrutiny, their lack of narrow tailoring is fatal. They are also unconstitutionally overbroad, because they reach an overwhelming range of protected expression with few—if any—conceivable constitutional applications.

### A. The First Amendment protects Plaintiffs' expression.

Defendants do not contest that the First Amendment protects each Plaintiff's expression. Nor could they, as settled precedent confirms those protections. *See supra* Section II.A (citing decisions).

### B. The Challenged Bans are content-based restrictions on speech that trigger strict scrutiny.

As Plaintiffs explain, binding precedent establishes that each of the Challenged Bans and the institutions' implementing policies is content-based because they restrict only noncommercial expression. *See supra* Section I (citing Supreme Court and Fifth Circuit decisions). The state largely ignores the cases Plaintiffs cite. *See generally* Defs.' Br. Instead, Defendants argue that distinguishing between noncommercial and commercial speech is not content-based because commercial speech is regulated elsewhere.[21] *Id.* at 39–40. That argument defies the meaning of content-based.

Where "a law applies to particular speech" or "because of the topic discussed or the idea or message expressed" it is "content based" and

---

[21] Defendants also disagree with the district court's suggestion that the Act violates the First Amendment bar on viewpoint discrimination. Defs.' Br. 41–44; *see also* ROA.465–66. Plaintiffs acknowledge the Challenged Bans are not viewpoint-based on their face. Still, as Plaintiffs explain, the Act invites viewpoint

"presumptively unconstitutional." *Reed*, 576 U.S. at 163–64. The Challenged Bans cover only "expressive activities," which by statutory definition, ensnares protected noncommercial speech while excluding commercial speech. Tex. Educ. Code §§ 51.9315(a)(2); 51.9315(f)(2)(B)(ii-iv); –(f)(2)(F). That is a textbook content-based restriction under *Reed*. 576 U.S. at 164.

What's more, the universities' policies expressly *permit* specific types of commercial speech. For instance, student organizations at both campuses can "advertise … merchandise," "request contributions" and "sell, distribute, and display literature that contains advertising," while individual students may even invite salespeople into residence halls to "offer products or services for sale." ROA.710–11 (UT-Dallas Revised Policy § 8(2)(a)–(d)); *see also* ROA.736 (UT-Austin First Revised Policy § 13-205(2)(A)–(D)). Just like the Act, those policies require a person to examine the content of speech to determine whether it is noncommercial and subject to a Challenged Ban. *Discovery Network,* 507 U.S. at 429–30.

---

discrimination through arbitrary enforcement of the boundless Challenged Bans. *See supra* Section II.C; *see infra* Section IV.F.

In sum, the net effect is that the Act discriminates against noncommercial speech.

## C. The Act fails strict scrutiny.

Because the Challenged Bans draw lines based on the commercial or noncommercial content of expression, they are content-based and violate the First Amendment unless Defendants prove they are "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163; *Widmar*, 454 U.S. at 270. Defendants cannot meet that burden. In fact, they forgo addressing either prong of strict scrutiny. *See* Defs.' Br. 39–45. That alone is enough to hold Plaintiffs are likely to succeed on the merits. *See Reed*, 576 U.S. at 171 (affirming the government bears the burden to show a content-based law satisfies strict scrutiny).

In any case, the Act does not serve a compelling state interest. *See Widmar*, 454 U.S. at 270. True enough, Texas has an interest in preventing campus disruption and ensuring campus safety. *See* ROA.798. But that is *not* the interest the Challenged Bans serve. Instead, those bans do nothing but restrict protected noncommercial campus speech, with no regard for whether expressive activity is substantially disruptive or poses an imminent threat to campus safety. That leaves

only privileging commercial speech over noncommercial speech, which the state cannot justify. *See RTM Media, L.L.C.*, 584 F.3d at 224–25 (discussing *Discovery Network*, 507 U.S. at 417).

Even crediting Texas's professed interest in curbing campus disruption, the Challenged Bans are far from the least restrictive means of achieving that goal. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). Start with the Overnight Expression Ban's prohibition on all noncommercial protected speech for ten hours each day, which is not the least restrictive means to accomplish anything, let alone preventing campus disruption or ensuring campus safety. Rather, it is both underinclusive and overinclusive.

On one hand, the Overnight Expression Ban is directed not to prohibiting disruptive conduct during class hours, but after classes have ended, when university interests in its academic mission wane. *See Roberts v. Haragan*, 346 F. Supp. 2d 853, 872–73 (N.D. Tex. 2004) (university's interests in its "academic mission are most pronounced" within "classrooms and other facilities" when they are being used for academic purposes). And it permits commercial speech—no matter how disruptive. At the same time, it forbids all protected noncommercial

48

speech for ten hours a day, regardless of whether it is disruptive. *Cf. Police Dep't. v. Mosley*, 408 U.S. 92, 95–101 (1972) (holding content-based prohibition on all picketing near schools violated the First Amendment where government's exclusion of labor picketing from did not satisfy any interest in preventing disruption to schools).

To put this in perspective, under the Act, an ROTC student who salutes the flag when it is raised at dawn risks disciplinary action. So does the protester peacefully holding a sign at sunrise. When the clock strikes ten, a Jewish student must remove his yarmulke, and a Political Science student must remove his MAGA hat. The student journalist who publishes a breaking story from her dorm room at 10:30 p.m. is subject to disciplinary action. Meanwhile, the ban does not restrict students who pass out flyers after 8:00 p.m. to advertise sales of their group's ticketed fundraiser.

Likewise, the End-of-Term Bans are not the least restrictive means to meet any compelling state interest. Just like the Overnight Expression Ban, they treat protected expression as per se disruptive. Consider the prohibition on percussive instruments, which applies anywhere on campus, in any context, during the final two weeks of any term. That

prohibition extends, for example, to performances by SOUnD in venues specifically set aside for musical performances. ROA.37 ¶¶ 134–35, ROA.39 ¶ 143. So too for the Invited Speaker Ban. For instance, it would cover FOCUS quietly worshipping with its invited ministers on a UT-Dallas lawn, ROA.36 ¶¶128–29, or YAL's student members and invited YAL representatives peacefully tabling on the UT-Austin Speedway, ROA.34 ¶¶117–21.

Of course, universities can bar conduct that materially and substantially disrupts their functions. *See* Tex. Educ. Code § 51.9315(c)(2). As the district court correctly observed, existing laws and university policies show it is possible to narrowly address disruptive and unsafe conduct without limiting all noncommercial expression. ROA.468–69. The Act does neither, underscoring its unconstitutional scope.

For these reasons, it is unsurprising that Defendants make no effort to justify the Challenged Bans' extensive sweep or that of the implementing policy at UT-Dallas, which adopts the Act verbatim as "required by law." *See* ROA.711–12 (UT-Dallas Revised Policy §§ B.9(6)

& (9)). Rather, they defend only UT-Austin's implementing policies as sufficiently narrow. But that defense fails.

For one thing, the Act's mandates control, especially as UT-Austin has failed to disclaim any intent to not enforce those bans as the Legislature wrote them. *See supra* Sections I and II.A. And while Defendants claim the UT-Austin policy would not reach Plaintiffs' overnight expression because it applies only to "disruptive … expressive activity in a common outdoor area." Defs.' Br. 31 (citing UT-Austin *Institutional Policies* § 13-301), they miss the point. That policy, as the district court correctly pointed out, "still singles out expressive activity and thus is underinclusive of commercial speech." ROA.472.

Because the government cannot satisfy either element of its strict scrutiny burden by demonstrating a compelling government interest or sufficiently narrow tailoring, its ban is unconstitutional.

## D.   Strict scrutiny applies regardless of public forum type.

Though Defendants protest the district court's failure to conduct a forum analysis, Defs.' Br. 45, their grievance is an empty one—strict scrutiny still applies. Above all, the public forum doctrine is an inapt framework for analyzing campus-wide speech regulations like the

Challenged Bans. Try as Defendants may, they cannot reduce the UT-Austin or UT-Dallas campus to a single designated or limited public forum. Rather, university campuses are a collection of different property types with different purposes, including residential living spaces, buildings set aside for classroom instruction, indoor spaces intended for entertainment and social functions, and open areas traditionally used for expressive purposes. *See Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 116–17 (5th Cir. 1992) (comparing universities to towns because they are composed of "a community of full-time residents"); *United States v. Kokinda*, 497 U.S. 720, 728–29 (1990) (holding that the "location and purpose" of a particular sidewalk is "critical" to determining whether that sidewalk is a public forum).

That is why this Court held that courts are not required to "choose between the polar extremes of treating an entire university campus as a forum designated for all types of speech by all speakers, or, alternatively, as a limited forum where any reasonable restriction on speech must be upheld." *Just. for All v. Faulkner*, 410 F.3d 760, 766 (5th Cir. 2005). Still, Defendants assert the district court should have considered whether the

Act would be permissible in campus limited public fora. Defs.' Br. 47. This argument fails for two reasons.

First, because campuses also include designated and traditional public fora (as Defendants appear to concede, *see* Defs.' Br. 46), the restrictions are still subject to strict scrutiny. *See Just. for All*, 410 F.3d at 769. Second, under this Court's decision in *Justice for All*, strict scrutiny applies because (1) Plaintiffs are members of the class for whom the universities open campus spaces for expressive activities, *id.* at 766–67, and (2) the university's purpose in maintaining these forums is facilitation of student expression, *id.* at 768–69 (citing *Hays Cnty. Guardian*, 969 F.2d 111). *See also Healy*, 408 U.S. at 180–81 (recognizing the "surrounding environs" of a university campus as "peculiarly the 'marketplace of ideas'"). So even if, as Defendants contend, forum analysis were the appropriate framework in this case, strict scrutiny would still apply, and they still would fail to satisfy it.

**E.** **Even if subject to lower levels of scrutiny, the Act violates the First Amendment.**

Defendants alternatively claim the Challenged Bans and implementing policies are content-neutral time, place, and manner restrictions. Defs.' Br. 3, 4, 8–10, 17, 18, 39, 41, 45. But as the Supreme

Court's and this Court's precedents confirm, those bans are not content neutral. *See supra* Sections I and IV.B. Yet it ultimately makes no difference because, as the district court correctly concluded, the Challenged Bans cannot satisfy even intermediate scrutiny. ROA.472–74, ROA.478. And it is telling that Defendants insist the bans are content-neutral time, place, and manner restrictions, but make no effort to show the bans are "narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication," as the First Amendment requires. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983).

To start, the Challenged Bans are not narrowly tailored for the reasons described above. "A regulation is narrowly tailored" only where it "does not burden substantially more speech than is necessary to further the government's legitimate interest." *Just. for All*, 410 F.3d at 770 (citation omitted). But the Challenged Bans far exceed Texas's proffered interest, for example, "in preventing disruption during final exams and while students are resting in their dormitories." Defs.' Br. at 18.

Take the Overnight Expression Ban. It restricts all noncommercial expression between 10:00 p.m. and 8:00 a.m., 365 days a year, in all

campus spaces. That regulates significantly, if not exponentially, more expression than necessary to limit disruption on a bustling state university campus. In fact, it threatens a near-endless range of important, protected expression—whether that is *The Retrograde*'s reporting, ROA.30 ¶¶ 97–99, UTD FOCUS's early-morning prayer, ROA.29 ¶ 91, or Strings Attached's evening performances, ROA.31 ¶¶ 101–104. And those are but a sliver of the countless other daily "expressive activities" on campus the ban endangers. None of these are disruptive, but the ban sweeps up all of them, whether they occur in a student's own bedroom or the wide-open area of the campus quad.

The Act's End-of-Term Bans also fail narrow tailoring. Defendants do not contest how those bans limit speech several weeks a year, reaching expression that will have zero effect on students' ability to prepare for finals. *See* Defs.' Br. 20. Adult students, not administrators, should decide whether they can de-stress while preparing for exams by listening to a concert or praying with an invited pastor.

Just consider the Amplified Sound and Drum Bans. They prohibit any amplified sound or use of percussion instruments, drawing no distinction between students using an amplifier on the library steps and

those using one in a campus performance hall. That underscores the restriction's lack of narrow tailoring, because to "bar the use of loud-speakers because their use can be abused is like barring radio receivers because they too make a noise." *Saia v. New York*, 334 U.S. 558, 562 (1948) (holding ordinance prohibiting use of amplification devices violated the First Amendment, because narrower limits would readily serve the government's interests).

The Invited Speaker Ban is equally flawed. It burdens students' First Amendment interests in hearing from guest speakers, associating with them as part of their organization's mission, and inviting them to campus to help communicate a group or individual's views. *See supra* Section II.A. The ban is not limited to substantially disruptive events, instead sweeping up UTD FOCUS's worship services reliant on off-campus pastors and YAL's political organizing which depends on help from YAL's off-campus leadership. ROA.33 ¶¶ 113–14; ROA.34 ¶¶ 117–21. Nor does it include clear criteria for unlawful conduct, locations where speakers might disrupt classes, or specific hours.

The Challenged Bans also fail to leave open alternative avenues of expression. *Perry Educ. Ass'n*, 460 U.S. at 45. Closing off an entire

campus to nearly all expression overnight lacks *any* alternative avenues—especially (but not only) for students who live on campus. And though Defendants might argue the End-of-Term Bans still allow students "to display signs, distribute literature, set up tables, and talk to fellow students," ROA.333 that doesn't save the Act. The Supreme Court rejected that argument decades ago, emphasizing that the expressive medium is often indistinguishable from the message expressed. *City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994). Hosting invited speakers and performing music to share a message are "quite distinct" from displaying a sign or merely talking. *Id.*

So even if the Court analyzed the Challenged Bans as content-neutral time, place, and manner restrictions, they would still fail constitutional scrutiny. The same is true even if the Court considers the requirement that speech restrictions must be "reasonable" (and viewpoint-neutral) in limited public forums. *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 12 (2018). There is nothing reasonable about banning all noncommercial protected speech, at all areas on campus, for ten hours a day, no matter what interest Texas asserts. Nor is it reasonable to ban nondisruptive expression—across campus and for

weeks out of the year—that involves guest speakers, amplified sound, or drums. In the end, the Challenged Bans cannot withstand any level of constitutional scrutiny.

### F. The Act is unconstitutionally overbroad.

Plaintiffs are also likely to succeed on their overbreadth challenge to the Challenged Bans because "a substantial number of [their] applications are unconstitutional, judged in relation to [their] plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta,* 594 U.S. 595, 615 (2021) (quoting *Stevens,* 559 U.S. at 473). By the Act's plain text, the Challenged Bans apply only to protected speech. *See supra* Section I. So any hypothetical applications to non-expressive conduct or unprotected speech fall outside the bans' scope, leaving them no legitimate sweep at all.

Even if the bans did have some legitimate sweep, the staggering range of unconstitutional applications towers over any conceivable constitutional ones. *E.g.*, ROA.28–40; *see also Moody v. NetChoice, LLC,* 603 U.S. 707, 723–24 (2024). Whatever limited application a restriction on late-night speech might serve in some places (e.g., blasting music next to a library or student dormitory), those fleeting applications are few in

comparison to the ban's near-limitless application to non-disruptive protected speech. So too for the Act's End-of-Term Bans, which subject students to discipline for non-disruptive speech—whether that is politely petitioning administrators for policy changes or playing tambourines outdoors on a sunny Saturday afternoon before finals.

As one might expect given the Act's scope, Defendants make no effort to refute overbreadth. Yet if there were ever a case tailor-made for the overbreadth doctrine, this is it. Consider, for instance, the far narrower speech ban recently enjoined in the Southern District of Indiana. *Wirtshafter v. Trs. of Ind. Univ.*, 784 F. Supp. 3d 1091 (S.D. Ind. 2025). There, a university enacted a speech ban in the wake of student protesters' overnight encampments in response to the Gaza-Israel conflict, prohibiting protests between the hours of 11:00 p.m. and 6:00 a.m. unless students obtained a permit or the activity was "spontaneous." *Id*. at 1098–99. The district court had no trouble finding the policy "hopelessly overbroad." *Id*. at 1108 (citation omitted).

The same result should follow against Texas' much broader Challenged Bans. Such extensive restrictions are a recipe for censorship, as they are "susceptible to selective application amounting to content-

based or viewpoint discrimination." *DeJohn v. Temple Univ.*, 537 F.3d 301, 313–20 (3d Cir. 2008) (enjoining university's sexual harassment policy under the overbreadth doctrine). And that is likely to happen. The Deans of Students at UT-Austin and UT-Dallas both acknowledge campus staff have unbounded authority to determine what is "disruptive." *E.g.* ROA.337 ¶ 7; ROA.341 ¶ 8.

Because UT System officials are very likely to enforce the Challenged Bans in arbitrary or discriminatory ways, it creates a danger that controversial or unpopular speech will bear the brunt. If the *Retrograde* were to publish a story embarrassing to university officials, the hour of their publication would invite disciplinary action. *See* ROA.730 (UT-Dallas Revised Policy § L.49(2)). Or, if some students took offense to UTD FOCUS's Christmastime event, ROA.36 ¶ 129, campus officials might appease those students by punishing the UTD FOCUS members who invited off-campus ministers to help lead the event.

In essence, the Act's sweeping bans on protected speech empower universities to appoint "literal speech police" to separate the wheat from the chaff. *See Speech First, Inc. v. Sands*, 144 S. Ct. 675, 675 (2024) (Thomas, J., dissenting). That unfettered discretion is anathema to basic

principles of the First Amendment—regardless of whether campus officials promise not to abuse their power. "We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *Stevens*, 559 U.S. at 480.

The district court correctly held the Act's bans on protected speech violate the overbreadth doctrine, and this Court should also affirm on that ground.

## V. Absent Affirmance, the Act's Certain Chill on Campus Speech Will Irreparably Harm Plaintiffs.

Defendants do not dispute Plaintiffs will suffer irreparable harm without an injunction, nor could they. If the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," ten daily hours of enforced silence qualifies. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The preliminary injunction currently in place ensures students can worship outside of state-prescribed weeks and hours, without fear of punishment if a service strays into territory that displeases university officials. It allows student journalists to carefully report time-sensitive news, rather than rush to get their stories out before the press must be

shut down for the night. Musicians don't have to give up their creative outlet during finals, and YAL members don't need to table their political discussions when ten o'clock rolls around. If the Act takes effect, Plaintiffs will suffer irreparable harm, forced to forgo protected speech to avoid punishment. ROA.44–45 ¶¶ 171–174, 176; ¶¶ 45–46 178–181, 184; ROA.47–48 ¶¶ 186–192, 194–95; ROA.48–49 ¶¶ 197–200; ROA.49 ¶¶ 202–205.

## VI.   The Public Interest Favors an Injunction Against S.B. 2972's Staggering Restrictions on Campus Speech.

The public interest and the balance of the equities favor an injunction in every respect. The balance of the equities and the public interest "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), and "injunctions protecting First Amendment freedoms are always in the public interest." *Healthy Vision Ass'n*, 138 F.4th at 408 (quoting *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013)). That is especially true here because "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Healy*, 408 U.S. at 180 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)).

Upholding the district court's injunction does not, as the government suggests, thwart universities' ability to address disruptions to the learning environment. If Texas wants to curb campus disruption, they have a simple answer: enforce existing—and much narrower—university policies and government ordinances against substantially disruptive conduct. *See* ROA.468–69.

The Act's unbounded sweep, on the other hand, meets no public interest. At bottom, states must foster—not censor—student expression at public universities. *See Healy*, 408 U.S. at 180–81 (protection of First Amendment is the "vital" interest at stake at public universities). The district court's injunction keeps the Act from thwarting the public interest in maintaining strong protections for campus expression.

## VII. The Scope of the District Court's Preliminary Injunction Is Proper.

The district court's injunction is designed to prevent the constitutional harm the Act would otherwise inflict. While Defendants play up how the injunction does not expressly mention UT-Austin and UT-Dallas policies implementing the Challenged Bans, Defs.' Br. 31, that does not lessen the injunction's force. The district court enjoined Defendants from enforcing the Challenged Bans against "expressive

63

activities." ROA.481–82. In every way, if Defendants must not carry out the Act's mandates, they must also not maintain or enforce the university policies implementing them.[22]

By enjoining Defendants from enforcing the Challenged Bans against any "expressive activities," the district court's injunction also faithfully follows the special equitable principles that apply on a First Amendment overbreadth challenge. When a law is facially overbroad, a court may enjoin "all enforcement of that law"—especially when a law has few if any constitutional applications, like the Act. *Virginia v. Hicks*, 539 U.S. 113, 119 (2003); *see also Moody*, 603 U.S. at 723 (recognizing that an overbroad law "may be struck down in its entirety"). This is because an overbroad law restricting speech causes injury not just by its application, but by "its very existence." *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 133 n.10 (1992) ("It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very

---

[22] Defendants' claim that Plaintiffs did not "seek an injunction against enforcement of the campus-specific policies" is incorrect. Defs.' Br. 31. Plaintiffs' briefing below explained why those policies violate the First Amendment and warrant injunctive relief. *E.g.* ROA.397–399.

existence that constitutes the danger to freedom of discussion." (quoting *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940))).

Facing such laws, many willing speakers will choose to remain silent rather than take on the "considerable burden … of vindicating their rights through case-by-case litigation," thus "harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Hicks*, 539 U.S. at 119. The district court's properly tailored injunction will prevent that harm. Indeed, it mirrors the type of preliminary injunction this Court has affirmed against an overbroad speech restriction like the Act. *See, e.g.*, *Hoover v. Morales*, 164 F.3d 221, 227 (5th Cir. 1998) (affirming preliminary injunction against all enforcement of both a system-wide Texas A&M University policy and a legislative provision prohibiting state employees from serving as expert witnesses in litigation against the state, finding both "impermissibly overbroad").

Of course, an injunction must be "narrowly tailored to remedy the specific action which gives rise to the order as determined by the substantive law at issue." *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (citation omitted) (cleaned up). And the district court's injunction

meets that standard. It is narrowly tailored to Defendants' specific action, and the substantive law of the overbreadth doctrine aligns with an injunction stopping Defendants from enforcing the Challenged Bans against all "expressive activities," which under the statutory definition, covers *only* protected expression.

Neither *Trump v. CASA*, 606 U.S. 831 (2025) nor *Carter v. Loc. 556, Transp. Workers Union of Am.*, 156 F.4th 459 (5th Cir. 2025), the cases Defendants rely on, involved the First Amendment context. *See* Defs.' Br. 48. Defendants also overextend *CASA*. *Id.* (citing 606 U.S. at 861). Nowhere did *CASA* question the Supreme Court's repeated conclusion that when a law is unconstitutionally overbroad, a court may enjoin "all enforcement of that law."[23] *Hicks*, 539 U.S. at 119; *see also Moody*, 603

---

[23] The important purpose of overbreadth challenges—and the special equitable principles that follow—harmonize with the principle that in some circumstances, complete relief may require an injunction to redress injuries to many who exercise the infringed legal right. *See Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023); 2 Joseph Story, Commentaries on Equity Jurisprudence §§ 853-54, at 147–49 (Boston, 2d ed. 1839) (citations omitted). This principle does not upset the presumption against nationwide or similarly broad injunctions. *CASA*, 606 U.S. at 845–46. Rather, in the overbreadth context, that principle ensures laws targeting speech do not cast sweeping chills on First Amendment rights. That's especially true here: Not only does the Act chill Plaintiffs' protected speech, it chills those with whom Plaintiffs might speak or associate, and those Plaintiffs want to listen to. So the district court's injunction," stopping Defendants from effectively silencing campus conversations and debates for hours or weeks at UT System institutions, "is necessary to give [Plaintiffs] the relief to which they are entitled." *Pro. Ass'n of Coll. Educators v. El Paso Cnty. Cmty. Coll. Dist.*, 730 F.2d 258, 274 (5th Cir. 1984).

U.S. at 723. In fact, *CASA* involved no First Amendment issues at all. *See generally* 606 U.S. 831. This Court should decline Defendants' invitation to apply a strained reading of *CASA*.

*Carter* is equally immaterial. There, the plaintiff invoked statutory, not constitutional rights, against two private defendants, not government actors. *Carter*, 156 F.4th at 476. A dispute between private actors requires greater sensitivity and precision in crafting an injunction to respect the rights of both parties. *Id.* at 501. But no such competing rights are at issue here—core First Amendment ones are. Nor is the district court's injunction "a carte blanche prohibition against vague conduct applied to a broad class." *Id.* Rather, it prohibits Defendants from enforcing specific provisions of a specific law the district court found overbroad and unconstitutional on its face.

## CONCLUSION

For these reasons, the Court should affirm the district court's preliminary injunction.

Dated: May 20, 2026

Respectfully,

/s/ JT Morris
JT Morris
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Ave., SE, Ste. 340
Washington, D.C. 20003
Tel: (215) 717-3473
jt.morris@fire.org

Adam Steinbaugh
Sara Berinhout
Hannah Abbott
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
Tel:   (215) 717-3473
adam@fire.org
sara.berinhout@fire.org
hannah.abbott@fire.org

*Attorneys for Plaintiffs-Appellees*

# CERTIFICATE OF COMPLIANCE

1.      This principal brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,435 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Local Rule 32.1 because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font, and in 12-point Century Schoolbook font for footnotes.

Dated: May 20, 2026

/s/ JT Morris
JT Morris
*Counsel of Record for*
*Plaintiffs-Appellees*

# CERTIFICATE OF SERVICE

This certifies that on May 20, 2026, in compliance with Rules 25(b) and (c) of the Federal Rules of Appellate Procedure, the undersigned served the foregoing via the Court's ECF filing system on all registered counsel of record.

Dated: May 20, 2026

/s/ JT Morris
JT Morris
*Counsel of Record for*
*Plaintiffs-Appellees*