No. 25-50914

# In the United States Court of Appeals for the Fifth Circuit

FELLOWSHIP OF CHRISTIAN UNIVERSITY STUDENTS AT THE UNIVERSITY OF TEXAS AT DALLAS; RETROGRADE NEWSPAPER; YOUNG AMERICANS FOR LIBERTY, INCORPORATED; ZALL ARVANDI; TEXAS SOCIETY OF UNCONVENTIONAL DRUMMERS; STRINGS ATTACHED,

*Plaintiffs–Appellees*,

v.

KEVIN P. ELTIFE, in his official capacity as a Member of the Board of Regents of the University of Texas System; JANIECE LONGORIA, in her official capacity as a Member of the Board of Regents of the University of Texas System; JAMES C. (RAD) WEAVER, his official capacity as a Member of the Board of Regents of the University of Texas System; NOLAN PEREZ, M.D., in his official capacity as a Member of the Board of Regents of the University of Texas System; ROBERT P. GAUNTT, in his official capacity as a Member of the Board of Regents of the University of Texas System; CHRISTINA MELTON CRAIN, ESQ., in her official capacity as a Member of the Board of Regents of the University of Texas System; JODIE LEE JILES, in his official capacity as a Member of the Board of Regents of the University of Texas System; KELCY L. WARREN, in his official capacity as a Member of the Board of Regents of the University of Texas System; JOHN M. ZERWAS, M.D., in his official capacity as Chancellor of the University of Texas System; JAMES E. DAVIS, in his official capacity as President of the University of Texas at Austin; PRABHAS V. MOGHE, in his official capacity as President of the University of Texas at Dallas; STUART W. STEDMAN, in his official capacity as a Member of the Board of Regents of the University of Texas System,

*Defendants–Appellants*,

On Appeal from the United States District Court
for the Western District of Texas,
No. 1:25-cv-1411, Hon. David A. Ezra

**Brief for Amici Curiae
Dr. Keith Whittington and Joe Cohn
in Support of Plaintiffs–Appellees**

Griffin S. Rubin
Sbaiti & Company PLLC
3102 Maple Avenue, Suite 400
Dallas, TX 75201
(214) 214-3414
gsr@sbaitilaw.com

*Counsel for* Amici Curiae

## Supplemental Statement of Interested Persons

Pursuant to Circuit Rule 29.2, the undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal.

**Amici Curiae:**     Dr. Keith Whittington
                      Joe Cohn

**Counsel for**       Sbaiti & Company PLLC
**Amici Curiae:**     Griffin S. Rubin (gsr@sbaitilaw.com)

/s/ Griffin S. Rubin
Griffin S. Rubin
*Counsel of Record for* Amici Curiae
*Dr. Keith Whittington and Joe Cohn*

# TABLE OF CONTENTS

Supplemental Statement of Interested Persons ...................................................i

Table of Authorities ........................................................................... iii

Interest of Amici Curiae .......................................................................1

Introduction and Summary of Argument .....................................................3

Argument ......................................................................................4

    I.    The Bans Are Not Reasonable Time, Place, and Manner Restrictions. ................................................................................4

        A.    The Bans Are Not Narrowly Tailored. ................................................5

        B.    The Bans Do Not Leave Open Ample Alternative Channels of Communication. ..............................................................10

        C.    Such Broad Prophylactic Measures Are at Odds with the First Amendment. ......................................................................12

    II.    The Bans Are Overbroad. .........................................................13

Conclusion ...................................................................................16

Certificate of Service ........................................................................18

Certificate of Compliance ...................................................................19

# TABLE OF AUTHORITIES

**Cases**

*Bd. of Trustees v. Fox*,
  492 U.S. 469 (1989) ..........................................................................8

*Beckerman v. City of Tupelo*,
  664 F.2d 502 (5th Cir. Unit A Dec. 1981)........................................7

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) ........................................................................14

*City Council v. Taxpayers for Vincent*,
  466 U.S. 789 (1984) ..................................................................... 5, 12

*Clark v. Cmty. for Creative Non-Violence*,
  468 U.S. 288 (1984) ..................................................................... 5, 10

*Frisby v. Schultz*,
  487 U.S. 474 (1988)........................................................................5, 6

*Grutter v. Bollinger*,
  539 U.S. 306 (2003) ..........................................................................3

*Hays Cnty. Guardian v. Supple*,
  969 F.2d 111 (5th Cir. 1992)....................................................... 8, 10

*Healy v. James*,
  408 U.S. 169 (1972)........................................................................3, 11

*Hill v. Colorado*,
  530 U.S. 703 (2000) ....................................................................... 13

*Keyishian v. Bd. of Regents*,
  385 U.S. 589 (1967) ..........................................................................3

*Knowles v. City of Waco*,
  462 F.3d 430 (5th Cir. 2006) ........................................................ 15

*Linmark Assocs., Inc. v. Township of Willingboro*,
  431 U.S. 85 (1977) .......................................................................... 11

*McCullen v. Coakley*,
  573 U.S. 464 (2014)................................................................... 10, 12

*McCutcheon v. FEC,*
572 U.S. 185 (2014) ............................................................................ 13

*NAACP v. Button,*
371 U.S. 415 (1963) ............................................................................ 12

*Riley v. Nat'l Fed. of Blind of N.C., Inc.,*
487 U.S. 781 (1988) ............................................................................ 12

*Rosenberger v. Rector of Univ. of Va.,*
515 U.S. 819 (1995) .............................................................................. 3

*Sec'y of State of Md. v. Joseph H. Munson Co.,*
467 U.S. 947 (1984) ............................................................................ 15

*Shelton v. Tucker,*
364 U.S. 479 (1960) ......................................................................... 8, 11

*Sweezy v. New Hampshire,*
354 U.S. 234 (1957) ...................................................................... 16, 17

*United States v. Stevens,*
559 U.S. 460 (2010) ............................................................................ 13

*United States v. Williams,*
553 U.S. 285 (2008) ............................................................................ 14

*Virginia v. Hicks,*
539 U.S. 113 (2003) ............................................................................ 14

*Ward v. Rock Against Racism,*
491 U.S. 781 (2021) ......................................................... 5, 7, 8, 10, 11

*Wash. State Grange v. Wash. State Republican Party,*
552 U.S. 442 (2008) ............................................................................ 13

**Statutes**

Tex. Educ. Code § 51.9315(d)(1) ..................................................... 10

**Other Authorities**

Bobby Blanchard, *PCL Extends Hours to Stay Open Overnight*, Daily Texan
(Aug. 29, 2012), https://thedailytexan.com/2012/08/29/pcl-extends-
hours-to-stay-open-overnight/ ........................................................... 6

Joseph Blocher, *Listening on Campus: Academic Freedom and Its Audiences*,
98 S. Cal. L. Rev. 1161 (2025)........................................................ 11

Keith E. Whittington, *Free Speech Is Under Threat on College Campuses. Here's
How to Fight Back*, Nat'l Rev. (Mar. 18, 2021, at 6:30 AM),
https://www.nationalreview.com/2021/03/free-speech-is-under-threat
-on-college-campuses-heres-how-to-fight-back/ ....................................3

Keith E. Whittington, *Professorial Speech, The First Amendment, and
Legislative Restrictions on Classroom Discussions,*
58 Wake Forest L. Rev. 463 (2023)........................................... 16

Keith E. Whittington, *Should Private Universities Tie Themselves to the First
Amendment?*, 27 J. Contemp. Legal Issues 169 (2025) ...........................8

Leslie Kendrick, *Speech, Intent, and the Chilling Effect*,
54 Wm. & Mary L. Rev. 1633 (2013) ........................................... 14

Spring 2026 Class Schedule, University of Texas at Austin,
https://utexas.app.box.com/s/09t8gvtjm5g6sqjqx7h3r00lpy2371if (last
updated Oct. 3, 2025) ......................................................7

Stephen Simpson, Sneha Dey, and William Melhado, *79 Arrested Amid
Second Crackdown on UT-Austin Campus*, Tex. Trib. (Apr. 30, 2024, at
9:20 PM), https://www.texastribune.org/2024/04/30/ut-austin-protest
-arrests/ ......................................................7

Tex. House Comm. on Higher Educ., Bill Analysis, S.B. 2972, 89th Leg.,
Reg. Sess. (2025) ......................................................5

## INTEREST OF AMICI CURIAE[1]

Dr. Keith E. Whittington is the David Boies Professor of Law and Faculty Director of the Center for Academic Freedom and Free Speech at Yale Law School. Dr. Whittington's teaching and scholarship span American constitutional theory, American political and constitutional history, judicial politics, the presidency, and free speech and the law. He is the author of *You Can't Teach That! The Battle over University Classrooms* (2024), and *Speak Freely: Why Universities Must Defend Free Speech* (2019), as well as law review articles and other published pieces on campus free speech. Dr. Whittington also serves as Founding Chair of the Academic Freedom Alliance's Academic Committee. He has a profound interest in the protection and preservation of campus free speech and academic freedom.

Joe Cohn is a research scholar in law and the Executive Director of the Center for Academic Freedom and Free Speech at Yale Law School. A majority of Mr. Cohn's career has been dedicated to defending civil liberties on college campuses and free expression in society at large. As the Foundation for Individual Rights and Expression's founding legislative and policy director, from 2012 to 2023, he testified on numerous occasions in legislatures across America and in Congress, drafted

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a), amici certify that the parties have consented to the filing of this brief. No counsel for a party authored the brief in whole or in part. No party, counsel for a party, or any person other than amici and their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

legislation on campus free speech, campus due process, and academic freedom that has been enacted in states across the country. Immediately before joining the Center for Academic Freedom and Free Speech, Mr. Cohn advocated for open inquiry, viewpoint diversity, and constructive disagreement in higher education as Heterodox Academy's director of policy. Like Dr. Whittington, Mr. Cohn has a profound interest in the protection and preservation of campus free speech and academic freedom.

Amici submit this brief in support of Plaintiffs–Appellees.[2]

---

[2] This brief has been prepared on behalf of and in conjunction with amici in their individual capacities. This brief does not present the institutional views, if any, of Yale Law School, Yale University, or any of its units.

"[U]niversities occupy a special niche in our constitutional tradition" given "the expansive freedoms of speech and thought associated with the university environment." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). The reason is straightforward: "The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas'"—one that "reaffirm[s] this Nation's dedication to safeguarding academic freedom." *Healy v. James*, 408 U.S. 169, 180–81 (1972) (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)).

Yet laws and regulations have proliferated in recent years that stifle campus speech, threatening to undermine these foundational principles. *See, e.g.*, Keith E. Whittington, *Free Speech Is Under Threat on College Campuses. Here's How to Fight Back*, Nat'l Rev. (Mar. 18, 2021, at 6:30 AM), https://www.nationalreview .com/2021/03/free-speech-is-under-threat-on-college-campuses-heres-how-to-fight-back/. Left unchecked, these restrictions transform institutions of higher learning into expressive deserts—the very antithesis of a functioning university. *See Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 835 (1995) (describing the "background and tradition of thought and experiment" present "in the University setting" "that is at the center of our intellectual and philosophic tradition").

The restrictions promulgated by the University of Texas at Austin ("UT Austin") and the University of Texas at Dallas ("UT Dallas")—particularly the Overnight Expression Ban and the End-of-Term Invited Speaker Ban[3]—are no exception. The district court correctly found them incompatible with the First Amendment, and amici seek to underscore two such deficiencies. First, neither the Overnight Expression Ban nor the End-of-Term Invited Speaker Ban qualifies as a *reasonable* time, place, and manner restriction; both sweep substantially broader than necessary to achieve Texas's stated aims and fail to leave open ample alternative channels for communication. Second, if there were ever a case for the overbreadth doctrine, this is it—the Overnight Expression Ban and the End-of-Term Invited Speaker Ban prohibit tremendous amounts of protected speech.

These deficiencies are especially acute on university campuses, where the resulting chill would stifle the very expressive activities that are the lifeblood of our institutions of higher learning. Amici respectfully urge the Court to affirm.

## ARGUMENT

### I. The Bans Are Not Reasonable Time, Place, and Manner Restrictions.

Appellants contend that the Overnight Expression Ban and the End-of-Term Invited Speaker Ban are time, place, and manner restrictions and should be evaluated

---

[3] Amici adopt Appellees' defined terms. *See* Red Br. at 9-10.

as such. *See, e.g.*, Blue Br. at 45-46. While *reasonable* time, place, and manner restrictions may pass constitutional muster, these bans are anything but. Such restrictions are permissible only if, among other things,[4] they are "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of . . . information." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). Even under the standard Texas advances, the Overnight Expression Ban and the End-of-Term Invited Speaker Ban fail both requirements—and in so doing upend the very institutions they purport to protect.

## A.     The Bans Are Not Narrowly Tailored.

To be narrowly tailored, the Overnight Expression Ban and the End-of-Term Invited Speaker Ban must not be "'substantially broader than necessary' to achieve [Texas]'s legitimate ends." *Ward v. Rock Against Racism*, 491 U.S. 781, 802 (1989) (quoting *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 808 (1984)). They are— both restrictions sweep drastically further than necessary to accomplish the government's stated interests in "prevent[ing] disruption and ensur[ing] campus safety." ROA.798 (Tex. House Comm. on Higher Educ., Bill Analysis, S.B. 2972, 89th Leg., Reg. Sess. (2025)).

---

[4] Time, place, and manner restrictions must also be content neutral. *Frisby v. Schultz*, 487 U.S. 474, 481 (1988). Amici agree with Appellees that these restrictions are not because "they restrict communicating a message for noncommercial purposes while exempting commercial speech." Red Br. at 20.

Both the Overnight Expression Ban and the End-of-Term Invited Speaker Ban prohibit noncommercial expressive activities in *all* places and in *all* manners during their prescribed time periods. Blanket prohibitions of this kind fail to "target[] and eliminate[] no more than the exact source of the 'evil' [they] seek[] to remedy." *Frisby*, 487 U.S. at 485.

Start with the Overnight Expression Ban. It proscribes all noncommercial expressive activities for nearly half of each day—regardless of where on campus the activity occurs or the manner in which it is conducted. At UT Austin, students walking back from the Perry–Castañeda Library to the Jester West Residence Hall discussing the day's macroeconomics lecture would violate the Overnight Expression Ban if they did so at 10:01 pm.[5] Nor could students at UT Dallas meet outside the Bioengineering and Sciences Building at 7:30 am to discuss a research project. Student radio and television must halt all broadcasts. Rehearsals for music groups and theater troupes must come to an end. Study groups must go silent.

*Any* student on campus between 10 pm and 8 am engaging in expressive activities concerning *any* topic—from politics to pop culture—runs afoul of the ban. It does not matter whether the speech is delivered through a megaphone or a whisper,

---

[5] Worth noting, the "PCL" is open during the Overnight Expression Ban. *See* Bobby Blanchard, *PCL Extends Hours to Stay Open Overnight*, Daily Texan (Aug. 29, 2012), https://thedailytexan.com/2012/08/29/pcl-extends-hours-to-stay-open-overnight/.

whether spoken or written. Nor does it matter how many students congregate. The sheer volume of constitutionally protected activity the Overnight Expression Ban prohibits defies justification. *See Ward*, 491 U.S. at 799 ("Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.").

The 10 pm to 8 am timeframe, moreover, does not correspond to any demonstrated need to prevent disruption or ensure safety. *See Beckerman v. City of Tupelo*, 664 F.2d 502, 512 (5th Cir. Unit A Dec. 1981) (precluding state actors from "regulating the time, place[,] and manner" of expressive activities in an "arbitrary or overly restrictive manner"). Expressive activities concerning academic discourse take place at all hours, but the 8 am to 10 pm window—the hours the ban does *not* cover—is when classes, examinations, office hours, and the like tend to occur. *See, e.g.*, Spring 2026 Class Schedule, University of Texas at Austin, https://utexas.app.box.com/s/09t8gvtjm5g6sqjqx7h3r00lpy2371if (last updated Oct. 3, 2025). Indeed, the very clash between student protestors and law enforcement in 2024 concerning the Israel–Gaza conflict—the impetus for S.B. 2972—did not take place during the hours the Overnight Expression Ban covers. *See, e.g.*, Stephen Simpson, Sneha Dey, and William Melhado, *79 Arrested Amid Second Crackdown on UT-Austin Campus*, Tex. Trib. (Apr. 30, 2024, at 9:20 PM)

https://www.texastribune.org/2024/04/30/ut-austin-protest-arrests/ (arrests occurred around 5 pm). The timing is thus not merely imprecise—it is incongruous. If universities "have an obligation" to provide an environment free from "potential disruptions," ROA.334, the Overnight Expression Ban addresses a problem that arises primarily during hours it leaves untouched. *See Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 118 (5th Cir. 1992) (narrow tailoring absent unless "the cost to speech is 'carefully calculated'" (quoting *Bd. of Trustees v. Fox*, 492 U.S. 469, 480 (1989))).

Texas may have an interest in preventing overnight encampments, but S.B. 2972's overnight ban is not so limited. It goes far beyond that aim, restricting *all* noncommercial speech during the prescribed hours. And even when a significant governmental interest exists, the narrow-tailoring requirement ensures the government does not sacrifice First Amendment rights for administrative convenience. *See Shelton v. Tucker*, 364 U.S. 479, 488 (1960) ("[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.").

The End-of-Term Invited Speaker Ban is equally problematic. It proscribes inviting speakers to campus during the last two weeks of a semester or term and, like the Overnight Expression Ban, applies to *all* places and *all* manners of speech on

campus. But the End-of-Term Invited Speaker Ban goes further still, barring this protected activity at *all* hours of the day. Whatever disruptions the End-of-Term Invited Speaker Ban might prevent pale in comparison to the staggering amounts of nontargeted expression it silences. *See Ward*, 491 U.S. at 799.

This lack of tailoring is compounded in the university setting, where it inflicts particular damage on the exchange of knowledge outside the classroom. Universities have always been supercharged exchanges for ideas—often outside the confines of a lecture hall. "[T]he student center, the campus bar, and the dining hall have all been important places for conversations that might or might not have begun in the classroom and that help make universities the interesting and fecund places that open the minds of students and help reshape society." Keith E. Whittington, *Should Private Universities Tie Themselves to the First Amendment?*, 27 J. CONTEMP. LEGAL ISSUES 169, 191 (2025).

The final two weeks of a semester frequently overlap with pivotal events in our society, and the End-of-Term Invited Speaker Ban would bar campus engagement with them. Had it been effective during the final two weeks of the 2026 spring semester, for instance, Republican student groups could not have invited Senator John Cornyn or Attorney General Ken Paxton to speak regarding the runoff for the Republican nomination for the United States Senate—despite the election being

mere weeks away. Had it been in effect during the final two weeks of the 2025 fall semester, faith-based organizations could not have invited theologians or clergy to speak about Christmas, Hannukah, or other religious winter holidays. The restriction thus furthers a governmental interest "at an inordinate cost to speech"—in particular, speech on matters of public concern. *Hays*, 969 F.2d at 118.

All told, Appellants have "not shown that [they] seriously undertook to address the problem[s] with less intrusive tools readily available to [them]." *McCullen v. Coakley*, 573 U.S. 464, 494 (2014). That alone demonstrates the restrictions are not properly tailored. And Appellants' effort to distance themselves from the plain text of their own restrictions is telling. *See, e.g.*, Blue Br. at 45-48. The language of both bans evidences a lack of tailoring irreconcilable with Supreme Court precedent and with the terms of S.B. 2972 itself. *See* TEX. EDUC. CODE § 51.9315(d)(1) (requiring "narrow[] tailor[ing]").

### B. The Bans Do Not Leave Open Ample Alternative Channels of Communication.

To qualify as permissible time, place, and manner regulations, the Overnight Expression Ban and the End-of-Term Invited Speaker Ban must also "leave open ample alternative channels for communication of . . . information." *Clark*, 468 U.S. at 293. The test is whether speakers may generally reach their intended audience. *See Ward*, 491 U.S. at 802. Under these restrictions, speakers decidedly cannot.

Both bans prohibit expressive activities campus-wide and impose temporal bounds—the Overnight Expression Ban from 10 pm to 8 am year-round, the End-of-Term Invited Speaker Ban at *all* times during the final two weeks of a semester or term. Proscribing "any particular manner or type of expression at a given place or time" is a strong indicator that alternative channels of communication are unavailable. *See id.*

How these restrictions limit speech "in practice" confirms the absence of alternative channels. *See Linmark Assocs., Inc. v. Township of Willingboro*, 431 U.S. 85, 93 (1977). The Overnight Expression Ban bars all noncommercial speech across campus in any manner—no alternative channel exists during the restriction's ten-hour window.[6] And the End-of-Term Invited Speaker Ban applies to *all* speakers and *all* formats: speakers must simply avoid engaging with campus communities for weeks at a time, irrespective of a topic's urgency or salience. Students' right to receive information from outside speakers does not pause for finals.[7] *See* Joseph Blocher, *Listening on Campus: Academic Freedom and Its Audiences*, 98 S. Cal. L.

---

[6] This prohibition in particular smothers the speech of those who reside on university campuses.

[7] There is no question the First Amendment does not take days off for the community at large—it applies 365 days a year. Public university campuses are no exception. *See Healy*, 408 U.S. at 180 ("[T]he precedents of this Court leave no room for the view that . . . First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'" (brackets omitted) (quoting *Shelton*, 364 U.S. at 487)).

Rᴇᴠ. 1161, 1174–75 (2025) ("[T]he very *raison d'être* for academic freedom . . . is the production and dissemination of knowledge, which presupposes recipients.").

The lack of ample alternative channels is plain—and unavoidable given the sheer breadth of these restrictions as written. The modes of communication remaining for students and other campus-goers are "inadequate," *Taxpayers for Vincent*, 466 U.S. at 812, and the Overnight Expression Ban and the End-of-Term Invited Speaker Ban therefore do not satisfy *Ward*'s third requirement.

### C. Such Broad Prophylactic Measures Are at Odds with the First Amendment.

The restrictions promulgated under S.B. 2972 set out to "prevent disruption and ensure campus safety." ROA.798. But abstract, amorphous goals of this kind underscore why the Overnight Expression Ban and the End-of-Term Invited Speaker Ban are neither narrowly tailored nor provide ample alternative channels for communication. The restrictions, absent greater precision, are "[b]road" and "prophylactic," and thereby "suspect" in "the First Amendment context." *NAACP v. Button*, 371 U.S. 415, 438 (1963).

Rightfully so. It is no small thing for a state actor to restrict expressive activities. While some restrictions on First Amendment activity are permissible, "the tailoring requirement prevents the government from too readily 'sacrificing speech for efficiency.'" *McCullen*, 573 U.S. at 486 (brackets omitted) (quoting *Riley v. Nat'l*

*Fed. of Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)). Broad, prophylactic speech restrictions are antithetical to narrow tailoring—preventing a generalized evil in the vicinity of speech will almost invariably sweep in protected expression. *See Hill v. Colorado*, 530 U.S. 703, 762 (2000) (Scalia, J., dissenting) ("Prophylaxis is the antithesis of narrow tailoring . . . .").

That is precisely the problem here. Preventing disruption and ensuring campus safety are admirable aims. But the free exchange of ideas fundamental to universities cannot be sacrificed at the altar of administrative convenience. "In the First Amendment context, fit matters." *McCutcheon v. FEC*, 572 U.S. 185, 218 (2014) (plurality opinion). And the fit between these sweeping restrictions and Texas's stated objectives cannot withstand *Ward*'s scrutiny.

## II. The Bans Are Overbroad.

The Overnight Expression Ban and the End-of-Term Invited Speaker Ban are also incompatible with the First Amendment because they are overbroad. "[A] law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). Rarely does a case fall

so squarely within the doctrine: the restrictions prohibit an exorbitant amount of First Amendment activity, making them plainly overbroad.

The overbreadth doctrine "seeks to strike a balance between competing social costs. On the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas." *United States v. Williams*, 553 U.S. 285, 292 (2008); *see* Leslie Kendrick, *Speech, Intent, and the Chilling Effect*, 54 WM. & MARY L. REV. 1633, 1653 (2013) ("An overbroad law is invalid not because it incidentally chills protected expression but because it directly reaches protected expression: hence the term 'overbroad.'"). "On the other hand, invalidating a law that in some of its applications is perfectly constitutional . . . has obvious harmful effects." *Williams*, 553 U.S. at 292. The Supreme Court therefore requires "a law's application to protected speech be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications, before applying the 'strong medicine' of overbreadth invalidation." *Virginia v. Hicks*, 539 U.S. 113, 119–20 (2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 615 (1973)).

"[I]f there were ever a case tailor-made for the overbreadth doctrine, this is it." Red Br. at 18. The Overnight Expression Ban prohibits *all* noncommercial speech—full stop. The End-of-Term Invited Speaker Ban bars invited speakers from

campus without exception. Within the sweep of these restrictions lies a staggering amount of protected speech, caught up in the state's generalized quest to prevent disruptions and ensure safety. The plain text of the Overnight Expression Ban and the End-of-Term Invited Speaker Ban "directly restricts protected First Amendment activity and does not employ means narrowly tailored to serve" the governmental interests at issue. *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 967 n.13 (1984); *see also, e.g.*, Red Br. at 12-14, 54-56 (providing examples demonstrating the bans' overbreadth). The restrictions apply to "such a broad range of expressive and legitimate conduct that [they are] hardly tailored at all, much less narrowly tailored to" achieve these aims. *Knowles v. City of Waco*, 462 F.3d 430, 435 (5th Cir. 2006). They are manifestly overbroad.

The chilling effect of both bans confirms as much. The Overnight Expression Ban would halt all noncommercial expressive activities during the hours it covers, stifling the very exchange of ideas core to a university's academic mission. The End-of-Term Invited Speaker Ban, though narrower in scope, bars expressive activities irrespective of the time of day, the place they occur, or the manner in which they take place. Together, these restrictions threaten to excise vast amounts of protected speech from the university setting—disabling students and faculty alike from engaging in activities foundational to academic freedom. *See* Keith E. Whittington,

*Professorial Speech, The First Amendment, and Legislative Restrictions on Classroom Discussions*, 58 Wake Forest L. Rev. 463, 498 (2023) (identifying "the heart of a university's mission" as "the effort to advance, preserve, and communicate knowledge"). This chill on speech—especially speech fundamental to the pursuit of knowledge—is precisely the harm the overbreadth doctrine's strong medicine exists to remedy.

## Conclusion

The restrictions Appellants adopted threaten to curtail all manners of expression inherent to institutions of higher learning and to fundamentally alter the university experience. Of all their flaws, the restrictions are inconsistent with the First Amendment in two critical respects: they are (i) not narrowly tailored and do not leave open ample alternative channels for communication, rendering them unreasonable, impermissible time, place, and manner regulations; and (ii) overbroad.

Halting these efforts now is pivotal—not only for universities in Texas, but for those across the country. If this law and the restrictions promulgated pursuant to it are permitted to stand, other states will chart the same course, compounding censorship and diminishing expressive rights on university campuses nationwide. Amici respectfully urge this Court to affirm, for "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and

understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) (plurality opinion).

Date:  May 27, 2026

Respectfully submitted,

*/s/ Griffin S. Rubin*
Griffin S. Rubin
Sbaiti & Company PLLC
3102 Maple Avenue, Suite 400
Dallas, Texas 75201
(214) 432-2899
gsr@sbaitilaw.com

*Counsel for* Amici Curiae
*Dr. Keith Whittington and Joe Cohn*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 27, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Griffin S. Rubin*
Griffin S. Rubin

## Certificate of Compliance

This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32.2 because it was produced using a computer and contains 3,831 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Circuit Rule 32.2. This filing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32.1 as well as the type-style requirements of Fed. R. App. P. 32(a)(6) because this filing has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Equity A font.

Date: May 27, 2026

*/s/ Griffin S. Rubin*
Griffin S. Rubin