No. 25-50914

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

FELLOWSHIP OF CHRISTIAN UNIVERSITY STUDENTS AT THE
UNIVERSITY OF TEXAS AT DALLAS; ET AL.,

*Plaintiffs-Appellees,*

v.

KEVIN P. ELTIFE, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE
BOARD OF REGENTS OF THE UNIVERSITY OF TEXAS SYSTEM, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division No. 1:25-CV-1411-DAE,
Hon. Robert Pitman, U.S. District Judge

## BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION OF TEXAS, STUDENTS ENGAGED IN ADVANCING TEXAS, EQUALITY TEXAS, DEEDS NOT WORDS, AND THOMAS S. LEATHERBURY AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES

*Counsel for* Amici Curiae

Brian Klosterboer      Charelle Lett      Chloe Kempf
Thomas Buser-Clancy  Adriana Piñon
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF TEXAS
P.O. Box 8306
Houston, TX 77288
(346) 299-6811

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS**

**Case Number and Style**: 25-50914, *FOCUS, et al., v. Eltife, et al.*

The undersigned counsel incorporate the Parties' certificates of interested persons and add the following persons and entities as described in the fourth sentence of Rule 28.2.1 who have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

### 1. *Amici-Curiae*

American Civil Liberties Union of Texas
Students Engaged in Advancing Texas
Equality Texas
Deeds Not Words
Thomas S. Leatherbury

### 2. Counsel for *Amici-Curiae*

Brian Klosterboer
Charelle Lett
Chloe Kempf
Thomas Buser-Clancy
Adriana Piñon


Respectfully,

*/s/ Brian Klosterboer*
Brian Klosterboer
*Counsel of Record for*
Amicus Curiae
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF TEXAS

**TABLE OF CONTENTS**

INTEREST OF *AMICI CURIAE* ................................................................1

INTRODUCTION ................................................................ 5

ARGUMENT ................................................................10

    I.    Censorship Efforts on College Campuses Cannot Evade
        Judicial Review ................................................................10

    II.   Plaintiffs Have Standing Because S.B. 2972 Regulates and
        Suppresses their Speech and Is Implemented and
        Enforced by University Officials................................................12

        A.    On its Face, S.B. 2972 Regulates Student Speech,
               Not Merely Universities ........................................14

        B.    S.B. 2972's Mandatory Requirements Suppressing
               Plaintiffs' Speech Are Not Salvaged by a Generalized
               First Amendment Savings Clause ........................17

        C.    Plaintiffs Suffer Injury-in-Fact and Chilling of
               Speech Due *Both* to S.B. 2972's Language *and*
               Defendants' Policies Implementing and Enforcing It .....19

    III.  Defendants' Arguments on Standing Could Chill First
         Amendment Rights by Insulating Numerous Laws from
         Constitutional Scrutiny................................................25

CONCLUSION ................................................................ 28

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Book People, Inc. v. Wong,*
  91 F.4th 318 (5th Cir. 2024) ................................................................... 24

*California v. Texas,*
  593 U.S. 659 (2021) ................................................................................ 22

*Chiles v. Salazar,*
  146 S. Ct. 1010 (2026).............................................................................. 11

*CISPES (Comm. in Solidarity with People of El Salvador) v.
  F.B.I.,*
  770 F.2d 468 (5th Cir. 1985) ...................................................................18

*City & Cnty. of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018).......................................................8, 18, 19

*Coalition for Independent Technology Research v. Abbott,*
  706 F. Supp. 3d 673 (W.D. Tex. 2023).............................................. 20, 21

*Doe v. Harrell,*
  841 F. App'x 663 (5th Cir. 2021) ........................................................... 22

*Fed. Election Comm'n v. Cruz,*
  596 U.S. 289 (2022) ............................................................................... 23

*Fed. Trade Comm'n v. Credit Bureau Ctr., LLC,*
  937 F.3d 764 (7th Cir. 2019)...................................................................19

*Fellowship of Christian Univ. Students at Univ. of Texas at
  Dallas v. Eltife,*
  806 F. Supp. 3d 662 (W.D. Tex. 2025) ...................................................17

*Franciscan All., Inc. v. Becerra,*
  47 F.4th 368 (5th Cir. 2022).................................................................. 23

*Gilles v. Blanchard,*
  477 F.3d 466 (7th Cir. 2007) .................................................................. 11

*Healy v. James,*
  408 U.S. 169 (1972) .............................................................................5, 12

*Houston Chronicle v. City of League City,*
    488 F.3d 613 (5th Cir. 2007) ....................................................................13

*Laird v. Tatum,*
    408 U.S. 1 (1972)..................................................................................... 25

*In re Lazarus,*
    478 F.3d 12 (1st Cir. 2007) ......................................................................18

*Lujan v. Def's of Wildlife,*
    504 U.S. 555 (1992) .................................................................................12

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ................................................................................ 22

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
    566 U.S. 639 (2012) ............................................................................ 8, 18

*Rosenberger v. Rector & Visitors of Univ. of Virginia,*
    515 U.S. 819 (1995) ................................................................................. 11

*Seals v. McBee,*
    898 F.3d 587 (5th Cir. 2018), *as revised* (Aug. 9, 2018) ........................18

*Shelton v. Tucker,*
    364 U.S. 479 (1960) .................................................................................. 5

*Speech First, Inc. v. Fenves,*
    979 F.3d 319 (5th Cir. 2020), *as revised* (Oct. 30, 2020)................*passim*

*Speech First, Inc. v. McCall,*
    138 F.4th 219 (5th Cir. 2025) ..................................................... 5, 20, 25

*Students for Justice in Palestine, at Univ. of Houston v. Abbott,*
    756 F. Supp. 3d 410 (W.D. Tex. 2024) ...............................................21, 23

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014)..................................................................................13

*Sweezy v. State of N.H. by Wyman,*
    354 U.S. 234 (1957)..................................................................................10

*Texas Top Cop Shop, Inc. v. Bondi,*
    No. 24-40792, 2025 WL 2609731 (5th Cir. Aug. 5, 2025)...................... 23

*Texas Top Cop Shop, Inc. v. Garland,*
758 F. Supp. 3d 619 (E.D. Tex. 2024) ...................................................... 23

*W. Virginia State Bd. of Educ. v. Barnette,*
319 U.S. 624 (1943) .................................................................................. 11

*Whole Woman's Health v. Hellerstedt,*
833 F.3d 565 (5th Cir. 2016) ............................................................ 9, 23

**Statutes**

Tex. Educ. Code § 51.9513 ..................................................................... 14

Tex. Educ. Code § 51.9315(f)(2)(B)(ii) ............................................... 6, 27

Tex. Educ. Code § 51.9315(f)(2)(B)(iii) .............................................. 6, 26

Tex. Educ. Code § 51.9315(f)(2)(B)(iv) ............................................... 6, 27

Tex. Educ. Code § 51.9315(f)(2)(F) ...................................................... 6, 26

**Other Authorities**

Author's/Sponsor's Statement of Intent, S.B. 2972, 88thReg.
Sess. (Tx. 2025),
https://capitol.texas.gov/tlodocs/89R/analysis/pdf/SB0297
2F.pdf .......................................................................................... 16

Bill Zeeble, *Report shows impact of anti-DEI law on Texas'*
*LGBTQ+ college students,* KERA News (April 1, 2025),
https://www.keranews.org/education/2025-04-01/report-
shows-impact-of-anti-dei-law-on-texas-lgbtq-college-
students ........................................................................................... 7

Jessica Cha, *UT students, faculty stage mock funeral to protest*
*academic freedom concerns*, KVUE (May 20, 2026),
https://www.kvue.com/article/news/education/university-
of-texas/ut-students-faculty-mock-funeral-protest-
academic-freedom/269-594cb478-2054-41f5-917f-
a6368aa4e1cf ..................................................................................... 6

Larry Buchanan, et al., *Black Lives Matter May Be the Largest Movement in U.S. History,* N.Y. Times (July 3, 2020)https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html.................................................7

Sneha Dey, *UT-Austin defends its handling of pro-Palestinian protest in federal trial,* Texas Tribune (May 11, 2026), https://www.texastribune.org/2026/05/11/university-texas-austin-student-lawsuit-2024-palestinian-protest/..................................7

**INTEREST OF *AMICI CURIAE*[1]**

The American Civil Liberties Union of Texas ("ACLU of Texas") is a nonpartisan, nonprofit organization with thousands of members and supporters across the State. Founded in 1938, the ACLU of Texas is headquartered in Houston and is the one of the largest ACLU affiliates in the nation. The ACLU of Texas works with communities, at the State Capitol, and in the courts to fulfill the promises of the Constitution for every Texan, no exceptions. From Amarillo to Brownsville and Beaumont to El Paso, we believe in a Texas that works for all of us—a Texas where each person has an equal say in the decisions that shape our future and everyone can build a good life. The ACLU of Texas has expertise in the First Amendment and an interest in guarding against government censorship of free expression and ideas, as well as an interest in principles of standing relevant to this brief.

Students Engaged in Advancing Texas (SEAT) is a nonpartisan and nonprofit grassroots civic organization led by students. Its mission is to educate, embolden, and mobilize students to advance equity and representation in Texas policy through community-based dialogue,

---

[1]    No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E), (b)(4); 5th Cir. R. 29.2.

leadership development, and informed civic engagement. SEAT establishes chapters and works with student organizations on college campuses across Texas. During recent academic years, SEAT has organized activities on these campuses, including community gatherings, panel conversations with high-profile guest speakers, and public demonstrations with amplified sound. SEAT has also been invited by various student organizations to speak at campus events and demonstrations. Since S.B. 2972 became law, university officials have limited, suppressed, and even attempted to cancel these student-initiated expressive activities citing new institutional policies and decision-making in compliance with state law.

Equality Texas is a nonpartisan, nonprofit organization that works to secure full equality for lesbian, gay, bisexual, transgender, and queer Texans through education, community organizing, and collaboration. Founded in 1978, Equality Texas has advocated for LGBTQIA+ Texans at the legislature and in communities across the state, including hosting and facilitating demonstrations against state laws that undermine the promise of freedom and equality for LGBTQIA+ Texans. Equality Texas seeks to protect and preserve the rights of LGBTQIA+ students and allies both to participate in civic life by protesting and in campus life by gathering as a community.

Deeds Not Words (Deeds) is a Texas-based non-profit organization that is guided by intersectional core values rooted in gender justice to help young leaders envision, challenge, and make a difference for a fair and just future. Deeds Not Words was founded in 2016 as a nonpartisan, nonprofit organization with hundreds of youth members and alumni spread across 10 chapters throughout the state of Texas. Deeds believes that strong communities, including at public universities, are the heart of positive change. Deeds is committed to fostering a sense of belonging and collaboration among individuals from diverse backgrounds. Its programs are designed to empower community members to actively engage, share their unique perspectives, and collectively work towards solutions that address the challenges they face. Through genuine relationships and inclusive initiatives, including on college campuses, Deeds strives to create resilient communities that uplift each other and drive sustainable progress. Deeds is dedicated to building power within the youth movement, ensuring that young Texans are able to use their voices for change in their communities.

Thomas S. Leatherbury is a solo practitioner in Dallas and a Clinical Professor of Law and the Director of the First Amendment Clinic at Southern Methodist University Dedman School of Law. He frequently represents individuals and organizations who believe their First Amendment rights

3

have been threatened or violated. The views expressed do not represent the institutional views of Southern Methodist University or any of its schools or units.

**INTRODUCTION**

Students, student organizations, faculty, and staff have long been able to challenge laws and policies that chill or censor their speech on college campuses. As the Supreme Court has repeatedly explained, "state colleges and universities are not enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169, 180 (1972). Because "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools," *Shelton v. Tucker*, 364 U.S. 479, 487 (1960), this Court has articulated straightforward standing principles that enable plaintiffs to seek pre-enforcement relief for the chilling of speech on college campuses. *See, e.g., Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020), *as revised* (Oct. 30, 2020); *Speech First, Inc. v. McCall*, 138 F.4th 219, 221 (5th Cir. 2025) ("Education should not be intended to make people comfortable; it is meant to make them think.") (citation and quotation omitted).

The Plaintiffs in this case meet every requirement for standing and injunctive relief, but Defendants seek to evade First Amendment scrutiny by distorting the text of S.B. 2972 and the district court's injunction. S.B. 2972 plainly imposes burdensome—and frankly, bizarre—restrictions on student speech on campus. It bars the use of "drums or other percussive instruments"

5

during the last two weeks of every "semester or term."[2] It prohibits "using a device to amplify sound,"[3] or "inviting speakers to speak on campus" during this same time period.[4] And, most sweepingly, it prohibits anyone, including students and student organizations, from "engaging in expressive activities on campus between the hours of 10 p.m. and 8 a.m."[5]

*Amici* work with and represent students, student organizations, faculty, and staff who express themselves and engage in First Amendment activity throughout the school year, including at night, early in the morning, and during the last two weeks of every term or semester. Just last week, for example, Students Engaged in Advancing Texas (SEAT) organized a funeral procession at the University of Texas at Austin to decry the loss of academic freedom due to recent university policies.[6] Equality Texas's staff members are frequently invited to be guest speakers on college campuses and the organization supports LGBTQIA+ students to express themselves through conferences, fundraisers, drag shows, alternative graduation ceremonies,

---

[2]    Tex. Educ. Code § 51.9315(f)(2)(B)(iv) ("End-of-Term Drum Ban").
[3]    Tex. Educ. Code § 51.9315(f)(2)(B)(iii) ("End-of-Term Amplified Sound Ban").
[4]    Tex. Educ. Code § 51.9315(f)(2)(B)(ii) ("End-of-Term Invited Speaker Ban").
[5]    Tex. Educ. Code § 51.9315(f)(2)(F) ("Overnight Expression Ban").
[6]    Jessica Cha, *UT students, faculty stage mock funeral to protest academic freedom concerns*, KVUE (May 20, 2026), https://www.kvue.com/article/news/education/university-of-texas/ut-students-faculty-mock-funeral-protest-academic-freedom/269-594cb478-2054-41f5-917f-a6368aa4e1cf.

and other events that are especially vital after public universities in Texas have dropped funding and support for programs and activities supporting LGBTQIA+ students.[7]

Student organizations and those who support them cannot always choose convenient timing for when they may be compelled to engage in expressive activity. In April 2024, for example, the Israel-Gaza War sparked nationwide protests by students, faculty, and others on college campuses at the end of the semester.[8] Six years ago, in May 2020, George Floyd was murdered on the streets of Minneapolis, which also triggered protests at universities throughout Texas and around the world.[9] While university schedules change based on commencement and final exams, global events do not. Students cannot predict when they need to exercise their First Amendments, including by hosting a guest speaker at the end of the term or by joining a worship service before dawn.

---

[7]     Bill Zeeble, *Report shows impact of anti-DEI law on Texas' LGBTQ+ college students*, KERA News (April 1, 2025), https://www.keranews.org/education/2025-04-01/report-shows-impact-of-anti-dei-law-on-texas-lgbtq-college-students.

[8]     Sneha Dey, *UT-Austin defends its handling of pro-Palestinian protest in federal trial*, Texas Tribune (May 11, 2026), https://www.texastribune.org/2026/05/11/university-texas-austin-student-lawsuit-2024-palestinian-protest/.

[9]     Larry Buchanan, et al., *Black Lives Matter May Be the Largest Movement in U.S. History,* N.Y. Times (July 3, 2020), https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html.

While university officials may certainly impose reasonable and viewpoint-neutral restrictions on student speech in limited or nonpublic forums, S.B. 2972 sweeps far beyond this. It applies everywhere on university campuses—including outdoor public spaces that are traditional public forums—and it entirely bars amplified sound, percussive instruments, and guest speakers in the last two weeks of every term, as well as all expressive activity between 10 p.m. and 8 a.m. These extensive (and unusual) speech restrictions would not satisfy rational basis review, let alone the heightened scrutiny required for content-based restrictions under the First Amendment.

Instead of focusing on the merits, Defendants attempt to rewrite S.B. 2972 to evade judicial review—primarily by claiming that the law "regulates universities, not students." Appellants' Br. 20. This argument defies the text of the statute and the straightforward chilling effect that it has on Plaintiffs' speech. S.B. 2972's savings clause also cannot vitiate standing or salvage the law's constitutionality because "the specific governs the general," *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citation omitted), and "[s]avings clauses are read in their context, and they cannot be given effect when the Court, by rescuing the constitutionality of a measure, would override clear and specific language." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018). In practice,

Defendants have also not invoked the savings clause to protect students' First Amendment rights but have instead followed the law's more specific commands to promulgate policies chilling Plaintiffs' speech.

Defendants try to further cast doubt on Plaintiffs' injuries by attributing them solely to university policies rather than S.B. 2972 itself. This maneuver misses the obvious fact that Plaintiffs' chilling of speech arises from **both** S.B. 2972 **and** its enforcement through campus policies. Just as federal courts are well within their authority to enjoin enforcement of a state law "along with its implementing regulations," *Whole Woman's Health v. Hellerstedt*, 833 F.3d 565, 567 (5th Cir. 2016), so too was the district court here correct to block Defendants from enforcing S.B. 2972, **including** through campus policies.

Embracing Defendants' counter-textual arguments on standing would be legally erroneous and set a dangerous precedent for expressive activity on college campuses and beyond. The Legislature could evade judicial review and "regulate cities, not churches" by requiring every municipality in Texas to adopt policies prohibiting religious institutions from holding worship services after 10 p.m. or before 8 a.m. The State could "regulate public parks, not protests" by mandating that park officials prohibit all expressive activity based on certain viewpoints. Or the Governor could "regulate state troopers,

9

not dissidents" by authorizing state police to create policies to arrest people for distributing literature on public streets. The First Amendment cannot and should not be so easily thwarted by the government recharacterizing its censorious efforts. The district court's decision is well-founded and should be affirmed.

## ARGUMENT

### I. Censorship Efforts on College Campuses Cannot Evade Judicial Review

By trying to reframe S.B. 2972 as a law that merely "regulates universities," Appellants' Br. 20, Defendants seek to sidestep binding case law that has long permitted students to challenge laws and policies that chill their constitutionally protected speech. The mechanisms that permit students and others to sue are vital for defending the marketplace of ideas at public universities, where "[t]he essentiality of freedom in the community of American universities is almost self-evident." *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250 (1957) ("Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.").

If state legislatures could dodge principles of standing by "regulat[ing] universities, not students," *contra* Appellants' Br. 20, they would be able to freely "prescribe what shall be orthodox in politics, nationalism, religion, or

other matters of opinion" at public universities. *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). But "[t]he First Amendment envisions the United States as a rich and complex place where all enjoy the freedom to think as you will and to speak as you think." *Chiles v. Salazar*, 146 S. Ct. 1010, 1020 (2026) (citation and quotation omitted). And reframing a content-based speech restriction as a regulation solely upon universities—where no one has standing to sue—would eviscerate the "axiomatic" principle that "the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995).

Whether convenient or not, the First Amendment has long been a bulwark against censorship efforts at public colleges and universities, and students and student organizations regularly have standing to sue university officials whose sovereign immunity is waived through *Ex parte Young*. If not for these well-trodden legal avenues, students would not be able to challenge university policies that chill controversial or contrarian speech, *Speech First, Inc.*, 979 F.3d at 330, university prohibitions on "religious activities" by student organizations, *Rosenberger*, 515 U.S. at 825, or university rules against proselytizing on the campus quad, *Gilles v. Blanchard*, 477 F.3d 466, 470 (7th Cir. 2007).

11

While free speech rights at public universities are not unlimited, they cannot be sidestepped by Defendants' attempts to distort long-established principles of standing. And these rights are not limited solely to in-class discussions or academic research. Instead, "[t]he college classroom **with its surrounding environs** is peculiarly the 'marketplace of ideas,' and we break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom." *Healy*, 408 U.S. at 180–81 (emphasis added).

## II.     Plaintiffs Have Standing Because S.B. 2972 Regulates and Suppresses their Speech and Is Implemented and Enforced by University Officials

The district court's standing analysis is correct because Defendants directly chill Plaintiff's speech through their implementation and enforcement of S.B. 2972.

At the preliminary injunction stage, Plaintiffs must only show that standing "is likely to obtain" and "[i]t is not hard to sustain standing for a pre-enforcement challenge in the highly sensitive area of public regulations governing bedrock political speech." *Speech First, Inc.*, 979 F.3d at 330-31. To have standing, a plaintiff must (1) have suffered an injury in fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision. *Lujan v. Def's of Wildlife*, 504

12

U.S. 555, 560–61 (1992). In the pre-enforcement context, a "plaintiff has suffered an injury in fact if he (1) has an "intention to engage in a course of conduct arguably affected with a constitutional interest," (2) his intended future conduct is "arguably . . . proscribed by [the policy in question]," and (3) "the threat of future enforcement of the [challenged policies] is substantial." *Speech First, Inc.*, 979 F.3d at 330 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161-64 (2014)). "[W]hen dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes [or policies] that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Id.* (quoting *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996)).

Critically, it does not matter for standing purposes whether a plaintiff challenges a law's chilling effect on speech, as in *Susan B. Anthony List*, or a policy, as in *Speech First*. If the plaintiff's intended future conduct is "arguably proscribed" by the law or policy in question, the plaintiff has standing since "[c]hilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Houston Chronicle v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007).

A. **On its Face, S.B. 2972 Regulates Student Speech, Not Merely Universities**

Here, Defendants do not seem to contest the first two requirements of standing for a pre-enforcement challenge based on chilling of speech that Plaintiffs' intended expression is affected with a constitutional interest and arguably proscribed by S.B. 2972. *See* Appellants' Br. 22. Instead, they assert:

> Plaintiffs cannot credibly allege a viable threat that S.B. 2972 will be enforced against them because the statute's commands and prohibitions do not apply to students. Instead, the statute regulates "institution[s] of higher education." Tex. Educ. Code § 51.9315(b)(1). As a result, S.B. 2972 simply cannot be enforced against Plaintiffs.

*Id* at 23. Contrary to this novel argument, however, the statute explicitly regulates the speech of students, student organizations, employees, and members of the public at universities throughout Texas.

The text of the law refers to "students" seven times, "student organizations" twice, and "employees" eight times. *See* S.B. 2972, 88th Reg. Sess. (Tx. 2025) (amending Texas Educ. Code § 51.9513). For example: "An institution of higher education ***shall . . . permit students*** enrolled at ***and employees*** of the institution  to engage in expressive activities in the common outdoor areas of the institution's campus freely, as long as the expressive activity: (1) is not unlawful; and (2) does not materially and

14

substantially disrupt the functioning of the institution." *Id.* § 2(c) (emphases added).

The law creates mandatory requirements that govern student speech by ordering that "[e]ach institution of higher education ***shall adopt*** a policy detailing rights and responsibilities regarding expressive activities at the institution." *Id.* § 2(f) (emphasis added). As applicable to this lawsuit, these policies "***must . . . prohibit*** . . .

>    (B) during the last two weeks of a semester or term, engaging in expressive activities:
>
>    . . .
>
>    (ii) by inviting speakers to speak on campus;
>
>    (iii) by using a device to amplify sound; or
>
>    (iv) by using drums or other percussive instruments;
>    . . .
>
>    (F) engaging in expressive activities on campus between the hours of 10 p.m. and 8 a.m. . . . ."

*Id.* § 2(f)(b) (emphasis added). These direct restrictions on students' speech are not optional but mandatory, and there is no textual support for Defendants' argument that S.B. 2972 does not directly regulate students' speech. The law's official statement of legislative intent supports these mandatory requirements, including by stating that one purpose of S.B. 2972 is to "prohibit protests or demonstrations during the last two weeks of a

15

semester" at all public universities in Texas in response to the "massive disruption" caused by college protests in April 2024.[10]

Despite Defendants' contention that the law does not directly regulate students' speech, S.B. 2972 contains an explicit enforcement mechanism requiring university officials to "***establish disciplinary sanctions*** for students, student organizations, or employees who unduly interfere with the expressive activities of others on campus ***or violate an institution policy or state law***." S.B. 2972 § 2(f)(2) (emphases added). The law further requires that universities "include a grievance procedure for addressing complaints of a violation of this section." *Id.* § 2(f)(3). Even if the specific punishments that university officials can inflict to enforce the law may vary from campus to campus, there is no support for Defendants' assertion that S.B. 2972 is a dead letter because it "contains no enforcement mechanism, either with respect to students or to universities themselves." Appellants' Br. 7.

Through its mandatory language, S.B. 2972 explicitly requires university officials to implement and enforce its regulations on student speech. And by requiring "disciplinary sanctions" against any student,

---

[10]     Author's/Sponsor's Statement of Intent, S.B. 2972, 88th Reg. Sess. (Tx. 2025), https://capitol.texas.gov/tlodocs/89R/analysis/pdf/SB02972F.pdf

student organization, or employee who "violate[s] an institution policy or state law," S.B. 2972 makes each of its prohibitions directly enforceable by the Defendants in this case.

### B.    S.B. 2972's Mandatory Requirements Suppressing Plaintiffs' Speech Are Not Salvaged by a Generalized First Amendment Savings Clause

Unable to evade the clear text of the statute that directly chills Plaintiffs' speech, Defendants invoke the law's savings clause to claim that "the campus policies that institutions adopt ***should be compatible with*** the First Amendment." Appellants' Br. 8 (emphasis added). But the law's generalized savings clause, which posits that "[n]othing in this section may be construed to limit or infringe on a person's right to freedom of speech or expression protected by the First Amendment to the United States Constitution or by Section 8, Article I, Texas Constitution," S.B. 2972 § 2(l), cannot override the law's specific mandates, which plainly chill and infringe Plaintiffs' freedom of speech and expression.

As the district court correctly found, "the statute's preamble and savings clause instructing universities to uphold the First Amendment does not change the fact that the statute then requires universities to adopt policies that violate those very constitutional protections." *Fellowship of Christian Univ. Students at Univ. of Texas at Dallas v. Eltife*, 806 F. Supp.

3d 662, 681 (W.D. Tex. 2025). The court further reasoned that university officials cannot comply with the law's mandatory requirements in a way that abides by the First Amendment "because to do so would run contrary the statute's mandates." *Id.*

Generalized savings clauses do not obstruct standing or salvage a statute's constitutionality because they must be "read in their context, and they cannot be given effect when the Court, by rescuing the constitutionality of a measure, would override clear and specific language." *City & Cnty. of San Francisco*, 897 F.3d at 1239. This accords with the interpretive canon of *lex specialis* "that the specific governs the general." *RadLAX Gateway Hotel, LLC*, 566 U.S. at 645.

The Fifth Circuit has affirmed that generalized savings clauses "cannot substantively operate to save an otherwise invalid statute." *CISPES (Comm. in Solidarity with People of El Salvador) v. F.B.I.*, 770 F.2d 468, 474 (5th Cir. 1985). Where a law's "plain text" requires unconstitutional applications, courts cannot invoke a generalized provision to override a statute's specific requirements. *Seals v. McBee*, 898 F.3d 587, 599 (5th Cir. 2018), *as revised* (Aug. 9, 2018); *accord In re Lazarus*, 478 F.3d 12, 18 (1st Cir. 2007) ("In statutory construction, the more specific treatment prevails over the general.").

18

Allowing a generalized savings clause to displace specific statutory requirements would ignore legislative intent and potentially nullify entire statutes. Laws "'cannot be held to destroy' themselves through savings clauses." *Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 775 (7th Cir. 2019) (quoting *Tex. & Pac. Ry. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 446 (1907)). And enabling a savings clause to somehow impair standing would render "judicial review a meaningless exercise, precluding resolution of the critical legal issues." *City & Cnty. of San Francisco*, 897 F.3d at 1240. Thus, while S.B. 2972 pays lip service to the First Amendment through a generalized savings clause, its more specific requirements plainly chill Plaintiffs' speech and expression, thereby triggering standing and subjecting the law's enforcement to constitutional scrutiny.

C.   **Plaintiffs Suffer Injury-in-Fact and Chilling of Speech Due *Both* to S.B. 2972's Language *and* Defendants' Policies Implementing and Enforcing It**

Unable to rely on the savings clause, Defendants also attempt to insulate S.B. 2972's chilling of speech from judicial review by attributing Plaintiffs' injuries solely to university policies rather than the statute itself. *See e.g.* Appellants' Br. 23 ("S.B. 2972's provisions are not enforceable against Plaintiffs and therefore do not cause any alleged injury."). But this

obfuscates the reality that it is **both** S.B. 2972 **and** the policies implementing it that chill Plaintiffs' speech and cause injury-in-fact.

Students whose speech is chilled by university policies have long had standing to challenge them, regardless of how those policies arise. "It is not hard to sustain standing for a pre-enforcement challenge in the highly sensitive area of public regulations governing bedrock political speech." *Speech First, Inc.*, 979 F.3d at 331. Even where university officials have argued that speech policies do not "actually prohibit the students from saying what they would like to say, and there's no substantial threat of future enforcement," the Fifth Circuit has consistently recognized that students and student organizations have standing to challenge speech policies that chill their expression. *Speech First, Inc.*, 138 F.4th at 223.

Speech restrictions are equally challengeable when they stem from state laws and directives instead of internal university policies. In *Coalition for Independent Technology Research v. Abbott*, the Texas Governor issued an executive order directing public universities to "ban its officers and employees from downloading or using TikTok on any of its government-issued devices." 706 F. Supp. 3d 673, 680 (W.D. Tex. 2023). Pursuant to that executive order, the University of North Texas "promulgated its own policies" that "prevent[ed] or seriously imped[ed] faculty from pursuing

20

research that relates to TikTok." *Id.* Even though the plaintiffs' chilled speech arose from ***both*** the executive order ***and*** the university's policy implementing it, the court found the claims justiciable because the university officials were "clearly tasked with enforcing Texas's TikTok ban vis-à-vis UNT." *Id.* at 683. The university officials even "concede[d] that Plaintiff has standing" against them because they were clearly tasked with enforcing the TikTok ban at UNT in ways that directly chilled Plaintiffs' speech. *Id.* at 685.

In a similar case, Governor Abbott issued a separate executive order directing Texas universities to update their speech policies following "multiple protests and walkouts" relating to Israel and Palestine. *Students for Justice in Palestine, at Univ. of Houston v. Abbott*, 756 F. Supp. 3d 410, 414 (W.D. Tex. 2024). In response to that executive order, university officials "revised their speech policies to comply," including by adopting a new definition of antisemitism that labeled some student expressive activities as antisemitic and chilled their speech. *Id.* at 415. After considering that "it is not hard to sustain standing for a pre-enforcement challenge in the highly sensitive area of public regulations governing bedrock political speech," the court found that Plaintiffs had standing to sue the university official defendants for promulgating policies that chilled their speech—even though the impetus for the policies was the Governor executive order. *Id.* at 421-22.

Here, the fact that universities' speech policies have changed due to a state law does not alter this analysis. Plaintiffs' injuries arise from **both** S.B. 2972 **and** the university policies implementing it, and the proper defendants for Plaintiffs' claims are university officials—not the State Legislature. This accords with *Ex parte Young*, which authorizes suit against state officials, not public universities, *see Doe v. Harrell*, 841 F. App'x 663, 668 (5th Cir. 2021), and it complies with standing principles because Plaintiffs' injuries are directly traceable to the university officials who are tasked with implementing and enforcing S.B. 2972's speech restrictions. *See Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923) ("The party who invokes the power [of Article III courts] must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury **as the result of its enforcement**") (emphasis added); *see also California v. Texas*, 593 U.S. 659, 669–70 (2021) ("[O]ur cases have consistently spoken of the need to assert an injury that is the result of a statute's actual or threatened **enforcement**, whether today or in the future.").

It is also common for courts to enjoin government defendants from enforcing a statute under **both** the text itself **and** implementing policies or regulations. As the Supreme Court has explained, "it ordinarily would not

22

matter whether a plaintiff was challenging the statute's enforcement or instead the enforcement of a regulation and, in doing so, raising arguments about the validity of the statute that authorized the regulation." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 300 (2022). For example, in *Whole Woman's Health v. Hellerstedt*, this Court enjoined defendants from taking action to enforce a state law "along with its implementing regulations." 833 F.3d 565, 567 (5th Cir. 2016). In *Texas Top Cop Shop, Inc. v. Garland*, a district court enjoined defendants from enforcing ***both*** the Corporate Transparency Act ***and*** "its Implementing Regulations." 758 F. Supp. 3d 607, 619 (E.D. Tex. 2024), *appeal held in abeyance sub nom. Texas Top Cop Shop, Inc. v. Bondi*, No. 24-40792, 2025 WL 2609731 (5th Cir. Aug. 5, 2025); *see also Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 373 (5th Cir. 2022) (affirming an injunction stopping officials "from interpreting or enforcing Section 1557 . . . or any implementing regulations thereto").

This ability of courts to enjoin defendants from enforcing a statute ***and*** its implementing policies or regulations is vital for defending against violations of the First Amendment. As the district court in *Students for Justice in Palestine* found, "the chill of Plaintiffs' speech is surely traceable to those who revised the policies," even though the policies were revised based on the Governor's executive order. 756 F. Supp. 3d at 422.

It also does not undermine Plaintiffs' standing that S.B. 2972 might result in university officials implementing and enforcing "campus-specific policies"; that those policies may vary slightly from campus-to-campus; or that university leaders may delegate enforcement authority to their subordinates. *Contra* Appellants' Br. at 25. That a government official enforces a statute "through" another person or entity "is not fatal to Plaintiffs' standing" because "[c]ourts have found that plaintiffs have standing to sue government entities that injure them through another entity." *Book People, Inc. v. Wong*, 91 F.4th 318, 330 (5th Cir. 2024). Similarly, the university officials named as Defendants here are clearly tasked with enforcing S.B. 2972 against Plaintiffs, and any variation or delegation they undertake as part of that duty does not obviate the clear traceability of Plaintiffs' injuries to these officials.

While conceding that "[c]ampuses are specifically directed to establish disciplinary sanctions," Defendants contend without support that "Plaintiffs cannot credibly allege a viable threat that S.B. 2972 will be enforced against them." Appellants' Br. at 5, 23. As this Court held in *Book People, Inc.*, however, "direct enforcement" by a Defendant "is not required" so long as "Plaintiffs [] identif[y] specific actions that this court can enjoin." 91 F.4th at 335. Moreover, the "mere existence, without more" of the universities'

policies implementing S.B. 2972 still chills Plaintiffs' speech. *Speech First, Inc.*, 979 F.3d at 335. Plaintiffs have standing to sue when their speech is "at least arguably regulated[] by the University speech policies," *id.* at 332, and "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 11 (1972). Thus, regardless of how exactly S.B. 2972's prohibitions are enforced, the law and its implementing policies trigger a chilling effect on Plaintiffs' speech, and the "disciplinary sanctions" that the law calls for even create a "direct prohibition against the exercise of First Amendment rights." *Id.*

## III. Defendants' Arguments on Standing Could Chill First Amendment Rights by Insulating Numerous Laws from Constitutional Scrutiny

This Court has steadfastly defended free speech on college campuses by holding that students have standing to challenge university policies that chill their speech. *See, e.g., Speech First*, 979 F.3d at 330; *Speech First*, 138 F.4th at 221. If the Court were to change course and embrace Defendants' novel jurisdictional arguments, it would effectively immunize S.B. 2972 and similar laws from constitutional scrutiny. This would greenlight flagrant First Amendment violations in this case while opening the door to widespread censorship.

25

First, the Overnight Expression Ban prohibits all "expressive activities on campus between the hours of 10 p.m. and 8 a.m."[11] For ten hours each day, the State Legislature has seemingly banned *all* First Amendment expression on college campuses, without exception. This prohibits students from gathering at 11 p.m. to celebrate a monumental football victory, or from congregating at sunrise to pray and worship together. It bars student organizations from holding marathon fundraisers that last all night, and it stops fraternities and sororities from expressing their pride in Greek life by engaging in activities before dawn. While universities can certainly create reasonable and viewpoint-neutral time, place, and manner restrictions, it is far too sweeping—and clearly unreasonable—to entirely ban expressive activity for ten hours a day.

Second, the Amplified Sound Ban prohibits the use of *any* "device to amplify sound" through expressive activities at the end of *each* term or semester.[12] Including fall, winter, summer, and interim terms, this provision suppresses a potentially limitless number of events and activities relying on amplified sound. From a peaceful protest with a megaphone to a prayer rally on the campus quad, this aspect of S.B. 2972 censors speech and makes it

---

[11]   Tex. Educ. Code § 51.9315(f)(2)(F).
[12]   Tex. Educ. Code § 51.9315(f)(2)(B)(iii).

26

inaccessible to many. Most graduation festivities rely on amplified sound so that everyone can hear, but now student organizations are forbidden from amplifying sound during the last two weeks of every term. This is nonsensical and risks prompting universities to violate federal and state disability laws, since many expressive events and activities would now be inaccessible to many.

Third, the Invited Speaker Ban bars expressive activities involving guest speakers during the last two weeks of every term or semester.[13] This means that LGBTQIA+ student organizations cannot invite elected officials to speak at or celebrate their graduation, just as religious organizations cannot invite faith leaders to pray during commencement festivities. There is no rational basis to ban all guest speakers at the end of each term, especially when guests are often critical to the lifeblood and functioning of each university.

Finally, the Drum Ban is equally arbitrary by preventing "using drums or other percussive instruments" during the last two weeks of every term.[14] This means that if a university's basketball team wins a critical game right before winter break, the drumline must fall silent even if the rest of the band

---

[13]     Tex. Educ. Code § 51.9315(f)(2)(B)(ii).
[14]     Tex. Educ. Code § 51.9315(f)(2)(B)(iv).

can continue to play. Choirs can sing during final exam season, but the slightest hint of a tambourine is forbidden.

Clearly, these prohibitions are not rational, and they would fail any level of constitutional scrutiny. That may be why Defendants insist that courts cannot even reach the merits by trying to reframe the law as only "regulat[ing] universities" rather than so clearly infringing students' constitutional rights. But to embrace Defendants' jurisdictional arguments could insulate this law and others like it from *any* First Amendment scrutiny, thereby threatening the entire marketplace of free expression on college campuses and beyond. Under the guise of "regulat[ing]" government entities, the State Legislature could compel local governments, state agencies, and public schools to censor disfavored speech and engage in viewpoint discrimination. This is not—and cannot—be the law, and the Court should reject Defendants' invitation to depart from settled precedent and radically rewrite standing principles for pre-enforcement challenges.

## CONCLUSION

The Court should affirm the decision below and uphold Plaintiffs' First Amendment rights.

DATED:  May 27, 2026

Respectfully submitted,

*/s/ Brian Klosterboer*

Brian Klosterboer
Charelle Lett
Chloe Kempf
Thomas Buser-Clancy
Adriana Piñon
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF TEXAS
P.O. Box 8306
bklosterboer@aclutx.org
clett@aclutx.org
ckempf@aclutx.org
apinon@aclutx.org

**CERTIFICATE OF SERVICE**

I hereby certify that on the 27th day of May, 2026, a true and correct copy of the foregoing was filed electronically using the CM/ECF system, which served counsel for the parties.

*/s/ Brian Klosterboer*
Brian Klosterboer

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of <u>Fed. R. App. P. 29(b)(4)</u> because this brief contains 5,042 words, excluding the parts of the brief exempted by <u>Fed. R. App. P. 32(f)</u>.

This brief complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)</u> and the type style requirements of <u>Fed. R. App. P. 32(a)(6)</u> because it has been prepared in a proportionally spaced typeface using Microsoft Word in Georgia, font size 14.

*/s/ Brian Klosterboer*
Brian Klosterboer

## CERTIFICATIONS UNDER ECF FILING STANDARDS

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

/s/ *Brian Klosterboer*
Brian Klosterboer