# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 17, 2026

Lyle W. Cayce
Clerk

No. 24-60558

John Rash,

*Plaintiff—Appellant/Cross-Appellee*,

*versus*

Lafayette County, Mississippi,

*Defendant—Appellee/Cross-Appellant*.

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 3:20-CV-224

Before Wiener, Engelhardt, and Oldham, *Circuit Judges*.

Andrew S. Oldham, *Circuit Judge*:

University of Mississippi professor John Rash wants to host an art exhibition at his local county courthouse. Citing the county's facility use policy, local officials rejected Rash's permit application. The district court enjoined the county from enforcing the policy's nighttime ban but held that Rash lacked standing to challenge other provisions. We affirm the permanent injunction, reverse in part the district court's dismissal on standing, and remand for further proceedings.

# I

## A

Lafayette County, Mississippi ("the County") is governed by a Board of Supervisors ("the Board"). The Board employs a County Administrator to manage County affairs. *See* MISS. CODE ANN. § 19-4-1. The County seat is Oxford, Mississippi, home to the University of Mississippi ("Ole Miss"). In the middle of town, the City of Oxford boasts a bustling Town Square. At the center of the square sits the Lafayette County Courthouse.

The courthouse is a multi-story building with white walls and pillared entrances. The surrounding grounds form an octagon. Fencing and a perimeter sidewalk shield the grounds from the nearby street, and benches and landscaping are scattered throughout. Crosswalks extend from breaks in the perimeter fence in each cardinal direction. These crosswalks allow pedestrians to cross the street and enter the grounds on all four sides of the town square.



The public uses the courthouse grounds for all types of activities, including social gatherings, prayer services, holiday celebrations, and political protests, often around the Confederate statue on the southern edge of the grounds. The square is most active on nights and weekends, in large part because Ole Miss students pass through the area to frequent nearby bars. Police maintain a "strong . . . presence" around the square. ROA.3359.

For most of its history, the County did not have a written policy to regulate the public's access to the courthouse and its grounds. But in 2015, the County adopted a Facility Use Policy ("the Policy"). The Policy required residents to obtain permits to use County facilities, including the grounds. The County has since amended that Policy several times—often in response to increased protest activity. *See* ROA.3359–66 (describing amendments adopted in March 2019, June 2020, July 2020, and January 2021); Red Br. Add. at 1–9 (outlining amendments adopted in November 2024).

These numerous, sometimes overlapping amendments make the description (and adjudication) of this case confusing. So, with apologies to the reader, we first describe the provisions as they were written on June 15, 2020 or July 20, 2020. Throughout this opinion, we refer to these provisions as "the 2020 Policy."[1]

Six provisions of the 2020 Policy are relevant here: (1) a provision closing the grounds at night ("curfew provision"), ROA.3364; ROA.4414; (2) a provision requiring groups of five or more to apply for a permit "for use" of the grounds ("'five or more' provision"), ROA.3362–63; ROA.4402; (3) a provision requiring individuals to apply for a permit

[1] The 2020 Policy was in effect when Rash applied for his use permit. ROA.3369 (noting that Rash submitted his permit application on July 14, 2020). Six days after Rash applied for his permit, the County amended the policy. *See* ROA.3363–64 (describing the July 20, 2020, Policy Amendments). We turn to the 2024 amendments in Part II, *infra*.

fourteen days in advance ("advance notice provision"), ROA.4414; (4) a provision requiring applicants to pay for security if the sheriff finds it "reasonably necessary . . . for traffic control and public safety" ("sheriff fees provision"), ROA.4548; (5) a provision requiring applicants to release and indemnify the County from liability and to buy insurance for large events ("insurance-and-indemnification provision"), ROA.4546–47; and (6) a provision reserving the County's right to deny a permit "depending on the nature of the proposed use," including if the event would pose an "unreasonable health or safety risk" ("denial of proposed usage provision"), ROA.4547.

B

John Rash is an Oxford resident and assistant film professor at Ole Miss. He frequently participates in or organizes film and other arts festivals with arts-focused interest groups in the community. One of the events he spearheads is called PROJECT(ion), a "free public art event . . . where artists project their work onto screens and other surfaces" at night. ROA.3369.

In 2020, Rash decided he wanted to host PROJECT(ion) on the courthouse grounds. The courthouse's white walls were an ideal surface for nighttime projections, and the grounds' high visibility made it an ideal place to encourage the local community to engage with the artists' work. So on July 14, 2020, he applied for a permit. On July 23, 2020, the County Administrator denied his application. She told Rash that the Board's newly enacted curfew provision forbade her from issuing any permits for events "after dusk, due to security issues." ROA.3370–71.

On July 31, 2020, Rash sued the County. He alleged that the Policy "imposes an unconstitutional prior restraint and violates the First Amendment's prohibition against unreasonable and content-based time, place, and manner restrictions in a traditional public forum." Blue Br. at 28.

After a bench trial, the district court permanently enjoined the County from enforcing the curfew provision against Rash. The court held that the curfew provision, as applied to Rash's 2020 permit application, was an unreasonable time, place, and manner restriction.

The district court dismissed Rash's remaining claims without prejudice. The district court concluded that Rash had not clearly demonstrated an injury in fact sufficient to bring as-applied or facial pre-enforcement challenges against the other five provisions. The court also held that Rash lacked standing to bring a facial vagueness challenge against the curfew provision.

The parties cross-appealed. Their disputes are three: (1) whether amendments to the Policy render this case moot; (2) whether the district court correctly enjoined enforcement of the curfew provision against Rash; and (3) whether Rash is entitled to a facial injunction against enforcement of six Policy provisions.

## II

We begin with mootness.

A case becomes moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quotation omitted). Though a challenge to a state law "usually becomes moot if the challenged law has expired or been repealed," the repeal or amendment of a law will not always moot a case. *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020). For example, if the government repeals an ordinance and replaces it with a new one that is "sufficiently similar," then the case is not moot because it is "permissible to say that the challenged conduct continues." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 & n.3 (1993). This is true even if the amended or new ordinance "disadvantage[s]" the

plaintiff "to a lesser degree than the old one," so long as the ordinance "disadvantages [the plaintiff] in the same fundamental way." *Id.* at 662. The party asserting mootness bears the burden of persuasion. *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968).

After the district court permanently enjoined the County from enforcing the curfew provision in the 2020 Policy, the County amended it. The County contends that its latest amendment—the 2024 Policy—moots the district court's permanent injunction against enforcement of the 2020 curfew provision.

We disagree. The 2020 curfew provision states that "[u]se of the County Courthouse exterior grounds will not be permitted between 30 minutes before dusk thru [*sic*] and until dawn." ROA.4546. How different is the 2024 version? The courthouse grounds "are closed to all uses beginning *one hour after sunset* until dawn each day." Red Br. Add. at 5 (emphasis added); *see also ibid.* ("Non-prohibited casual uses and public assemblies are allowed (a) after 5:00 pm until one hour after sunset Monday through Friday, and (b) between dawn and one hour after sunset on Saturdays, Sundays and Holidays."). So the County's only adjustment to the curfew provision is the point at which the nighttime ban triggers—now, an hour after sunset instead of thirty minutes before dusk.

Changing the curfew's starting point from "dusk" to "sunset" eliminates none of the problems that led the district court to hold it unconstitutional as applied to Rash. Rash argues that the updated curfew, just like the old one, still "blanket prohibits all speech and activity" on the courthouse grounds "outside of limited daylight hours." Blue Br. at 48. Rash also says the new curfew still does not take into account the fact that "nighttime activity on the town square varies"—it bans nighttime permits on every day of the week with zero exceptions. ROA.3386; Blue Br. at 48.

These are the same concerns that led the district court to hold that the old provision did not serve a significant interest in public safety and burdened substantially more speech than necessary.

Nor do the other amendments in the 2024 Policy moot the case. The insurance-and-indemnification provision did not change at all. And the other provisions "disadvantage" Rash only "to a lesser degree" than their predecessors. *Associated Gen. Contractors*, 508 U.S. at 662. The amended advance notice provision reduces the deadline to file a permit application from fourteen days before the event to five. But it retains an "urgent need" exception, which Rash argues gives "impermissibly wide discretion" to the County Administrator to decide whether an applicant's First Amendment-protected speech qualifies for a waiver. Blue Br. at 52–53. The new sheriff fees provision adds a waiver for "all public assemblies engaged in speech protected under the First Amendment," Red Br. Add. at 8, but still reserves ultimate discretion to the sheriff. And the denial of proposed usage provision still gives the County discretion to deny a permit if an event poses an unreasonable health or safety risk without defining those terms.

The most significant change in the 2024 Policy affects the "five or more" provision. In 2020, the Policy required five or more people to obtain a permit "for use" of the courthouse grounds. ROA.4402. "Casual uses" of the grounds did not require a permit. Rash objected that the term "casual use" was vague and that the "for use" language allowed County officials to make content-based decisions about whether a group required a permit. For example, County officials testified that under the 2020 Policy, a group of five people "who wanted to express political views" would need a permit "for use" of the grounds, but a group of five people "sitting on the lawn praying together" would not. ROA.3367–68 n.9 (quotation omitted); ROA.4310–11.

The 2024 Policy retains that distinction. "[C]asual uses" still do not require a permit. Red Br. Addendum at 4-5. "[P]lanned events" require a permit. *Ibid.* And for "public assembl[ies]," the County will only approve applications from non-profit groups, not-for-profit citizen groups, and "[i]ndividuals and groups who are meeting for the purpose of engaging in political discussion or expression." *Id.* at 3.

While the 2024 Policy tries to clarify which types of uses require a permit and which do not, the revision does not moot Rash's arguments that the permit process is impermissibly content-based. In fact, Rash contends that the updated provision simply "doubles down" on the County's pre-existing, "explicitly content-based distinctions" by codifying the differential treatment of casual uses and political speech. Yellow Br. at 10. The County has not carried its burden to show the case is moot.

III

Next, we consider whether the curfew provision is consistent with the First Amendment. The parties spill lots of ink debating whether the curfew provision is content neutral. The question is complicated because the County revises the Policy almost as fast as airlines update their fare schedules. The record teems with conflicting testimony about how and to whom the curfew applies. And there are latent questions about whether and to what extent the County is selectively using its enforcement discretion.

We need not resolve any of this, however, because the district court's permanent injunction was proper in any event. We assume for the sake of argument that intermediate scrutiny applies (as the County argues). Even so, the curfew provision must be "narrowly tailored to serve a significant government interest and must leave open ample alternative channels of communication." *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 118 (5th Cir. 1992). The government bears the burden of meeting this standard. *Ibid.*

The County cannot meet it. We address (A) the County's interest in public safety and (B) narrow tailoring.

A

The County argues that it has a "compelling interest in promoting night-time pedestrian and traffic safety." Red Br. at 47. It points to the fact that the grounds are poorly lit, students regularly walk across them, and that recent public demonstrations revealed a "growing pedestrian and traffic safety issue which posed a strain on the Sheriffs [*sic*] Department." *Id.* at 46.

Public safety "in the abstract" is an important governmental interest. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 663 (1994). That the County's stated interest is important, however, does not mean this particular regulation "will in fact advance" that interest. *Id.* at 664. As the district court found, the County "presented considerable testimony" that the bacchanalia of Ole Miss students created safety concerns *in the town square*, but the County presented "no evidence" that those concerns extended *to the courthouse grounds*. ROA.3384–85 & n.17 (collecting trial testimony).

Rather, the County's evidence boils down to a fear that future nighttime events might lead to safety risks. But "[w]hen the [g]overnment defends a regulation on speech as a means to . . . prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured." *Turner*, 512 U.S. at 664 (quotation omitted). The harms must be "real, not merely conjectural," and the regulation must "in fact alleviate the[] harms in a direct and material way." *Ibid.* As the district court found, the County did not present such evidence.

B

Even if the Policy advanced the County's substantial interest in public safety, the curfew provision is not narrowly tailored to fit that interest.

A time, place, or manner restriction must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). "Even a legitimate government interest cannot justify a restriction if the restriction accomplishes that goal at an inordinate cost to speech." *Hays Cnty. Guardian*, 969 F.2d at 118.

The County has not shown the curfew provision is narrowly tailored. Even though trial evidence showed that nighttime activity on the town square varies, the nighttime ban applies from sundown to sunup. Even though the town square is busiest on Thursday, Friday, and Saturday, the curfew applies every day of the week. Even though there was zero trial evidence that violence, arrests, or pedestrian fatalities have occurred on the courthouse grounds, the curfew forbids grounds access to all permit applicants with zero exceptions. And it borders on impossible to find a regulation narrowly tailored when the government changes it to restrict speech in different ways after virtually every protest, parade, or permit application.

The County responds that the curfew provision is narrowly tailored because it is "tied to the time of day when darkness occurs." Red Br. at 48. But the question is not whether the curfew provision is reasonably related to the earth's rotation on its axis. The question is whether the provision is narrowly tailored to the County's public safety concerns.

*

The district court's decision to permanently enjoin the County from enforcing the curfew provision against Rash is affirmed.

IV

Next, we turn to Rash's facial challenges. The district court held that Rash lacks standing to bring facial challenges to six provisions of the Policy.

We disagree. We consider (A) the curfew provision and (B) the remainder of the provisions.

A

To establish Article III standing, plaintiffs must prove an "injury in fact that is fairly traceable to the defendant's conduct" and would likely be "be redressed by a favorable decision." *Collins v. Yellen*, 594 U.S. 220, 242 (2021) (quotation omitted). A plaintiff who seeks to challenge multiple provisions in an ordinance must establish an injury under *each* provision. *See Serv. Emps. Int'l Union, Loc. 5 v. City of Houston*, 595 F.3d 588, 598 (5th Cir. 2010). So, we start with the curfew provision.

From the beginning of this suit, Rash has contended that the curfew provision is both overbroad and unconstitutionally vague. *See, e.g.*, ROA.222–26 (amended complaint); Blue Br. at 47–48 (arguing the curfew "is [b]oth [o]verbroad and [v]ague"). Vagueness and overbreadth are distinct but related concepts. *See, e.g.*, *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494–95 (1982). A law can be overbroad without being vague—when, for example, it plainly and clearly proscribes protected speech. *E.g.*, *Lewis v. City of New Orleans*, 415 U.S. 130, 133 (1974); *see also Hoffman Ests.*, 455 U.S. at 495 ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."); *Williams*, 553 U.S. at 304 (same). And a statute can be vague even when it is not overbroad. *Hoffman Ests.*, 455 U.S. at 497. Overbreadth sounds in the First Amendment while vagueness sounds in the Fourteenth. *See ibid.* But despite their differences, both doctrines protect speech against governmental restrictions—and that can create doctrinal confusion.

As it did here. The district court held that Rash lacked standing to assert a vagueness challenge, *see* ROA.3374, but it never considered whether

Rash has standing to bring an overbreadth challenge. That was error because a plaintiff's inability to bring one challenge says nothing about his ability to bring the other. *Hoffman Ests.*, 455 U.S. at 495–97.

We agree with the district court that Rash lacks standing to challenge the curfew provision on vagueness grounds. Plaintiffs "who engage[] in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Holder v. Humanitarian L. Proj.*, 561 U.S. 1, 20 (2010). And that rule "makes no exception for conduct in the form of speech." *Ibid.* PROJECT(ion) requires darkness—it "can't exist in the daylight." ROA.3374. The curfew provision clearly proscribes events from taking place on the courthouse grounds after dark. Because his "speech is clearly proscribed," Rash has no standing to assert a Fourteenth Amendment vagueness challenge to the curfew provision "based on the speech of others." *Holder*, 561 U.S. at 20.

But Rash plainly has standing to bring a facial overbreadth challenge to the curfew provision. He has "produce[d] evidence of an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545 (5th Cir. 2008) (cleaned up). He wants to host PROJECT(ion), a projection-based arts festival, on the courthouse grounds at night. He has applied for a permit and has been denied because of the curfew. And he has testified that he would apply for a permit in the future if not for this provision. That evidence suffices to establish "standing to raise a First Amendment facial challenge." *Ibid.*; *cf. also Holder*, 561 U.S. at 20 (recognizing that even if Fourteenth Amendment vagueness challenge fails, a plaintiff "may have a valid overbreadth claim under the First Amendment").

B

Rash also brought pre-enforcement facial challenges to the "five or more" rule, the advance notice requirement, the sheriff protection fees provision, the insurance-and-indemnification provision, and the denial of proposed usage provision.[2] He contended that all these provisions chill protected speech in violation of the First Amendment. *Hou. Chronicle Publ'g Co. v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007). In a pre-enforcement challenge, a plaintiff may prove that his speech has been "chilled" by showing that: he (1) has an "intention to engage in a course of conduct arguably affected with a constitutional interest," (2) his "intended future conduct is arguably . . . proscribed by [the] statute" in question, and (3) "the threat of future enforcement" of the challenged policies "is substantial." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–64 (2014) (quotations omitted).

We consider (1) Rash's chilling injury and (2) whether that injury is traceable to the County.[3]

1

The challenged provisions chill Rash's speech.

*First*, Rash's trial testimony proves an intent to engage in a course of conduct affected with a constitutional interest as to all six provisions. Rash

---

[2] The County argues Rash did not preserve his facial challenge to the denial of proposed usage provision. We do not disturb the district court's conclusion that the Pretrial Order preserved this challenge. *See Martin v. Lee*, 378 F. App'x 393, 395 (5th Cir. 2010) (explaining that the trial court's "broad discretion" in interpreting a pretrial order will not be disturbed on appeal unless the ruling "was a clear abuse of discretion that would deem the action arbitrary").

[3] The parties do not dispute that a permanent injunction would redress Rash's facial challenges.

testified that he "intends to apply for permits and use the Courthouse Grounds for speech and assembly in the future." Blue Br. at 36 (citing ROA.3371, 3971–73, 3393, 4010–11, 4040). When he applies for that permit, all six provisions will regulate whether the County issues it.

*Second*, Rash must show that "his intended future conduct is arguably . . . proscribed" by the challenged provisions. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (quotation omitted). For facial overbreadth challenges, the provisions need only "regulate[]" and have a "deterrent, or chilling, effect" on his speech. *Id.* at 332, 335 (quotation omitted); *cf. Speech First, Inc. v. Schlissel*, 939 F.3d 756, 764–65 (6th Cir. 2019).

All five remaining provisions regulate and are likely to deter Rash's future permit applications. *Speech First*, 979 F.3d at 332. The "five or more" rule and insurance-and-indemnification provisions are likely to regulate Rash's future permit applications because past PROJECT(ion) events have had attendance surpass one hundred people. If those attendance numbers continue, Rash will be required to apply for a permit and provide the requisite insurance coverage.

The remaining provisions, including the sheriff fees provision, the advance notice requirement, and denial of proposed usage provision, also regulate Rash's future permit applications. True, whether Rash is subject to them depends on the County Administrator and sheriff's discretion. But the fact that an individual is "subject to" or "affected by" overbroad provisions of an ordinance—especially those that confer discretion on County officials—is what creates the risk of chilled speech. *CAMP Legal Def. Fund, Inc. v. City of Atlanta,* 451 F.3d 1257, 1274–75 (11th Cir. 2006).

*Third*, the "threat of future enforcement" must be "substantial." *Susan B. Anthony List*, 573 U.S. at 164. For facial pre-enforcement challenges in the First Amendment context, "courts will assume a credible threat of

[enforcement] in the absence of compelling contrary evidence." *Speech First*, 979 F.3d at 335 (quotation omitted). The County has not identified any such evidence. On the contrary, Rash will be subject to each of these provisions anytime he seeks a permit. *See CAMP Legal Def. Fund, Inc.*, 451 F.3d at 1271.

2

Finally, the "chilling" effect of each provision is traceable to the County. This point is straightforward: Rash will no doubt be subjected to the provisions' requirements, and those provisions deter or chill speech. Indeed, Rash testified that his "ability to get a permit" for PROJECT(ion) was "contingent on the results of this case," and he was hesitant to reapply until he knew the outcome of his constitutional challenges. ROA.3968. Rash's speech is therefore chilled by all six provisions.

*

Rash's decision to bring a facial challenge to the Policy "comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). On remand, Rash must identify the "*full range*" of Policy applications and show that their "unconstitutional applications substantially outweigh [the] constitutional ones." *NetChoice, L.L.C. v. Paxton*, 121 F.4th 494, 497–98 (5th Cir. 2024) (quotation omitted). That is a "heavy burden." *Id.* at 497. But it is nonetheless one that Rash has standing to attempt.

* * *

The district court's order is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.